# SUPPLEMENT.

---

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

It is not within the constitutional power of the Legislature to enact a law conferring upon cities and towns authority to establish and maintain municipal fuel or coal yards, or to purchase coal and wood for the purpose of selling it generally to their inhabitants or others at cost, at less than cost or at a profit.

In case of a scarcity of fuel, falling short of a famine, but so great as to create widespread and general distress in the community which cannot be met by private enterprise, if it appears that agencies of government can obtain fuel when citizens generally cannot, a city or town where these conditions exist may be authorized, under proper legislation, to purchase and sell fuel for the relief of the community, so long as these conditions continue. LORING, J. separately stating his opinion, that the conditions contemplated by the other justices as creating an emergency which would justify legislation authorizing temporary relief could not exist, and therefore that the remedy is purely theoretical and should not be considered.

THE following order was passed by the House of Representatives on January 14, 1903, and on January 16 was transmitted to the Justices of the Supreme Judicial Court. On January 28 the Justices returned the answer which is subjoined.

ORDERED, That the opinion of the Justices of the Supreme Judicial Court be required upon the following questions:

First, Is it within the constitutional power of the Legislature to enact a law conferring upon a city or town within this Commonwealth the power to purchase coal and wood as fuel, in excess of its ordinary requirements, for the purpose of selling such excess, so purchased, generally to its inhabitants or others (1) at cost, (2) at less than cost, or (3) at a profit?

Second, Is it within the constitutional power of the Legislature to enact a law conferring upon a city or town within this Commonwealth the power to purchase for the purpose of sale generally and to sell generally to its inhabitants or others (1) at

cost, (2) at less than cost, or (3) at a profit, coal and wood as fuel?

Third, Is it within the constitutional power of the Legislature to enact a law conferring upon cities and towns within this Commonwealth authority to establish and maintain municipal fuel or coal yards for the purpose of selling coal, wood or other fuel generally to the inhabitants of such cities and towns or others (1) at cost, (2) at less than cost, or (3) at a profit?

Fourth, If the answer to any of the foregoing questions be in the negative, does the power so declared as non-existent exist in the case of an extraordinary emergency, and may the different cities and towns be constituted judges of said emergency?

These questions are propounded with a view to legislation upon the subjects therein mentioned, and in respect to divers bills and resolves pending before the General Court, copies whereof are hereby ordered to be transmitted herewith to the Justices of the Supreme Judicial Court for their information.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

In reply to your order of January 14, 1903, a copy of which is annexed, the Justices of the Supreme Judicial Court respectfully give the following opinion.

The first three questions submitted to us are substantially the same as the three submitted to the justices on April 12, 1892, the answers to which appear in the Massachusetts Reports, volume 155, page 601. We adopt and reaffirm the doctrines stated in the first of the opinions then submitted to the House of Representatives. A separate opinion, then submitted by another of the justices, rests upon the same principles as the first. We do not deem it necessary to restate the reasons and arguments which have led legislatures and courts to nearly, if not quite, uniform conclusions in regard to the attitude which the government should maintain, under existing constitutions, towards the transaction of common kinds of business which can be conducted successfully by individuals, without the use of any governmental function. These can be found in numerous published opinions of the courts, some of which are cited in the opinion first above mentioned.

It is established that under our Constitution private property cannot be taken from its owner except for a public use. This is equally true whether the property is a dwelling house taken by right of eminent domain, or money demanded by the tax collector. The establishment of a business like the buying and selling of fuel requires the expenditure of money. If this is done by an agency of the government there is no way to obtain the money except by taxation. Money cannot be raised by taxation except for a public use.

Until within a few years it generally has been conceded, not only that it would not be a public use of money for the government to expend it in the establishment of stores and shops for the purpose of carrying on a business of manufacturing or selling goods in competition with individuals, but also that it would be a perversion of the function of government for the State to enter as a competitor into the field of industrial enterprise, with a view either to the profit that could be made through the income to be derived from the business, or to the indirect gain that might result to purchasers if prices were reduced by govermental competition. There may be some now who believe it would be well if business was conducted by the people collectively, living as a community, and represented by the government in the management of ordinary industrial affairs. But nobody contends that such a system is possible under our Constitution. It is plain, however, that taxation of the people to establish a city or town in the proprietorship of an ordinary mercantile or manufacturing business would be a long step towards it. If men of property, owning coal and wood yards, should be compelled to pay taxes for the establishment of a rival coal yard by a city or town, to furnish fuel at cost, they would thus be forced to make contributions of money for their own impoverishment; for if the coal yard of the city or town was conducted economically, they would be driven out of business. A similar result would follow if the business of furnishing provisions and clothing, and other necessaries of life, were taken up by the government; and men who now earn a livelihood as proprietors would be forced to work as employees in stores and shops conducted by the public authorities.

Except for the severely onerous conditions from which we are

now suffering, the causes of which arose outside of this State beyond the reach of our legislative enactments, there is nothing materially different between the proposed establishment of a governmental agency for the sale of fuel, and the establishment of a like agency for the sale of other articles of daily use. The business of selling fuel can be conducted easily by individuals in competition. It does not require the exercise of any governmental function, as does the distribution of water, gas and electricity, which involves the use of the public streets and the exercise of the right of eminent domain. It is not important that it should be conducted as a single large enterprise with supplies emanating from a single source, as is required for the economical management of the kinds of business last mentioned. It does not even call for the investment of a large capital, but it can be conducted profitably by a single individual of ordinary means. We therefore have no hesitation in answering the first three questions in the negative.

The fourth question presents greater difficulties. Evidently it is suggested by the painful experiences in attempting to procure fuel, from which we have lately been suffering. The questions are accompanied by copies of bills and resolves pending before the General Court, one of which is entitled, " An Act to authorize Cities and Towns to buy and sell Fuel in Certain Emergencies." This question must be interpreted in reference to the conditions to which it refers, and in reference to the remedy which it suggests. The only proposed remedy to which it relates is the establishment by a city or town of fuel or coal yards, or the purchase of coal, wood or other fuel, for the purpose of selling it to the inhabitants of the city or town, or to others. The only condition referred to in the question is " an extraordinary emergency," and the conditions referred to in the accompanying bill are " a scarcity of fuel and a pressing need thereof," and " a reasonable ground of belief that such a condition will occur in the near future."

It hardly can be contended that the remedy suggested by the question can have any effect upon the primary cause of all our troubles in this particular. That cause relates to sources of supply beyond the boundaries of this State. There is no reason to expect that any similar cause will arise within this State to

affect such small sources of supply as exist here. If it is possible to conceive of the existence of such a cause arising hereafter in this Commonwealth, it can be dealt with effectually, not by the establishment of municipal yards for the sale of fuel at retail, but by some different kind of legislation which will make it impossible for either of two parties to a controversy like that which lately existed in a neighboring State, to refuse all proposals for an equitable determination of the rights of the parties, and thus to bring both to the verge of ruin, and to imperil the industries, and to some extent the lives and health, of communities far away from the neighborhood of the conflict.

Looking to the possible consequences of the emergency for which a remedy is desired, they can be divided into four classes: First, an increase of the number of those who fall into distress and are in need of relief from the public authorities, because they have no means to buy fuel at a greatly increased price. Secondly, increased expenditure, to their serious detriment, by those who have the means to buy. Thirdly, a possibility of a famine in fuel, such as to make it impossible reasonably to supply the needs of the community for comfortable living. Fourthly, a scarcity falling short of a famine but so great as to create widespread and general distress in the community which cannot be met by private enterprise.

The first of these possible consequences does not call for legislation. Cities and towns now have ample power to provide in any reasonable way for paupers, whether it be by furnishing out-of-door relief or by support in almshouses, and whether their need of relief is permanent or caused by a temporary condition.

It is equally true that the second of these consequences does not justify taxation of those who do not have occasion to buy coal, for the benefit of those who do. The use of the money of taxpayers for such a purpose would not be a public use, but a use for the special pecuniary benefit of those who happen to be affected by the state of the coal market.

The third possibility, that of an absolute famine in fuel because of the lack of a supply and the impossibility of obtaining a sufficient quantity reasonably to satisfy the needs of the com-

munity, would be a condition which would warrant the expenditure of the public money under appropriate legislation, if the Legislature could discover a way through public agencies to supply the people. But it is difficult to see how the method referred to in the question could produce this result. If at any time there was an impossibility of obtaining supplies because the supplies were not here and could not be bought elsewhere, the opening of a city coal yard would furnish no relief. Such an establishment could not work a miracle of creation.

In reference to an anticipated possible famine, the procurement and storage of a supply in time of plenty might be a remedy or an alleviation if the dread anticipation should become a reality, but the maintenance of a city fuel yard to conduct the business of buying and selling in a time of plenty, would have no tendency to avert a famine, or to relieve from its consequences if one should come. We are not called upon to consider whether the Legislature would deem it advisable, if it has the power, to authorize cities and towns to build storehouses in which to keep large quantities of fuel in anticipation of a possible famine.

In regard to the fourth of the possible consequences, a condition in which the supply of fuel would be so small, and the difficulty of obtaining it so great, that persons desiring to purchase it would be unable to supply themselves through private enterprise, it is conceivable that agencies of government might be able to obtain fuel when citizens generally could not. Under such circumstances we are of opinion that the government might constitute itself an agent for the relief of the community, and that money expended for the purpose would be expended for a public use.

We do not think that we are expected to determine whether there might be any other conceivable emergency which would call for an affirmative answer to this question. Considering the question only in reference to the accompanying bills and the conditions to which we suppose it relates, our answer is in the negative, except in reference to the fourth of the above-mentioned possible consequences. As to that, we are of opinion that if the supposed conditions exist in any city or town, it may

be authorized, under proper legislation, to sell fuel with the limitations above stated, so long as these conditions continue.

MARCUS P. KNOWLTON.
JAMES M. MORTON.
JOHN LATHROP.
JAMES M. BARKER.
JOHN W. HAMMOND.
HENRY K. BRALEY.

January 28, 1903.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

I concur with my brethren in the above opinion excepting only in the answer given in case of the fourth possible consequence of a scarcity of fuel therein described.

I have not been able to persuade myself that, under the circumstances there supposed, a city or town could get any fuel to sell, if action were taken in the way in which, in the opinion of my brethren, it is permissible to proceed.

The question is the question of the absence of heat to support life in this latitude without a readjustment of the means of heating now generally in use. Coal in cities and wood or coal in towns may be taken to be a necessity of existence at the present time. Oil, or electricity developed by water power, until time for readjustment has come cannot be taken to be an adequate method of heating.

Were Massachusetts a coal-producing State, it may well be that to prevent such a scarcity of fuel as is described in the supposed case the State could intervene by regulating the business of mining coal, or other similar action, and thereby get coal for its inhabitants.

But where there is such a scarcity of coal that individual enterprise is not able to buy it, with all the powers which are attendant on organizations of individuals and with the foresight in buying before the event which prospective profits and a due consideration for their fellows would dictate, it is inconceivable that any coal could be got by cities or towns, which could be sold by them, if the course of action were taken which my brethren are of opinion is open to the Legislature to take.

I understand that in the opinion of my brethren the authority cannot be given until the scarcity referred to has been found by the Legislature to exist, and that the Legislature cannot authorize a city or town to buy the fuel which it is to sell when the city or town is of opinion that the scarcity referred to exists or is likely to exist. In my opinion, such a remedy is purely theoretical, and for that reason should not be considered in answering the questions which have been submitted to us.

Necessity is the only ground for justifying the government in entering upon the business enterprise of buying and selling coal; it is said that that necessity does not arise until it has been ascertained by the Legislature that the situation is so desperate that individual enterprise has failed to provide coal for the public to buy. Where the situation is so desperate, I cannot conceive how the interference of government, which is not to exercise any governmental function, can hope to be successful.

In answer to the third possibility, my brethren have demonstrated that establishing a coal yard will not meet the necessity produced by a famine. The same argument applies to the remedy of the government's setting up a coal yard in case of the fourth possibility. The only other thing the government can do in that contingency is to pay the difference between the price which has to be paid to the dealers and the reasonable price which is within the means of some members of the public. Such a payment is not, in my opinion, a payment for a public use, unless made in the exercise of the right to care for paupers.

I concur with my brethren that, fuel being a necessity, the State can provide its inhabitants with it in case of a famine, in the exercise of the power which makes it its duty to take care of paupers. I also concur in their opinion that the State cannot authorize its cities or towns to go into the coal business because the price of fuel is likely to be high. Practically, the question must, in my opinion, be one of these two, and there is no middle course open.

The fourth question, like the others, is " propounded with a view to legislation upon the subjects therein mentioned, and in respect of divers bills and resolves pending before the General Court, copies whereof are hereby ordered to be transmitted here-

with." The bills and resolves transmitted with the question do not contemplate a famine in fuel or a reasonable apprehension of a famine in fuel. For that reason the fourth question does not call for the expression of an opinion upon what can be done by the State under the power of assisting paupers in case of a famine in fuel or an apprehension thereof. And answering the fourth question as it was put, I answer it in the negative.

WILLIAM CALEB LORING.

THE HONORABLE HORACE GRAY, a Justice of this court from the twenty-third day of August, 1864, to the fifth day of September, 1873, and Chief Justice of the court from the last named day until the ninth day of January, 1882, when he became an Associate Justice of the Supreme Court of the United States, died at Nahant, on the fifteenth day of September, 1902.

A meeting of the members of the bar of this Commonwealth was held at Boston on the seventeenth day of January, 1903, at which a memorial was adopted, which was presented to the full court on the same day.

Before presenting the memorial the Attorney General addressed the court as follows:

The bar has delegated to me the honorable duty of presenting to the court its memorial adopted in memory of the late Mr. Justice Horace Gray, an Associate Justice of the Supreme Court of the United States, and former Chief Justice of this court. Were it possible for me to repeat to your Honors the memorable tribute the gentlemen of the bar have themselves spoken to-day, or to reflect something of the eloquence of their just and discriminating analysis of the qualities of the great jurist, who so long and in so many fields enriched our jurisprudence, then I would be assured that tribute worthy of its subject would be laid before this court to become a part of its own imperishable records.

The commanding form, the strong intellect, the inspiring voice, lived and spoke again to-day, as the men who knew, admired and loved him, told us, of a later day, of his virtues, his