ALEXANDER T. LAUGHLIN et als. *vs.* CITY OF PORTLAND.

Cumberland. Opinion April 4, 1914.

*Compensation. Constitution. Demurrer. Equity. Legislative Action.
Limitations. Municipal Coal and Fuel Yard. Private
Property. Public Uses. Taxes.*

1. The Legislature has, under the Constitution, full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to the Constitution of Maine, nor to that of the United States.

2. While the executive and the judiciary and other coördinate departments of government can exercise only the powers conferred upon them by the Constitution, the powers of the Legislature are absolute, except as limited by the Constitution.

3. As to the executive and judiciary, the Constitution measures the extent of their authority; as to the Legislature, it measures the limitations upon its authority.

4. The court is bound to assume that in the passage of any law the Legislature acted with full knowledge of all constitutional restrictions, and

intelligently, honestly and discriminatingly decided that it was acting within the constitutional limits and powers.

5. The power of taxation is akin to the rights of eminent domain, because it rests upon the right of the sovereign power to appropriate the private property of its citizens to public purposes.

6. The power of taxation must rest upon two elements in order to be permitted by the Constitution, first, a public use, and second, a public exigency.

7. The wants and necessities of the people change and the opportunity to satisfy those wants and necessities by individual effort may vary.

8. A class of public uses has grown up and been recognized within a comparatively recent time, due both to the growing needs of the community and to modern inventions calculated to meet those needs, that furnish a logical precedent for the case at bar. These public uses or utilities embrace water, light and heat.

9. R. S., ch. 4, sec. 87, authorizing and empowering cities and towns to establish and maintain within their limits a permanent wood, coal and fuel yard for the purpose of selling, at cost, wood, coal and fuel to their inhabitants, is constitutional.

On report. Bill dismissed with costs.

This is a bill in equity, brought by fifteen taxable inhabitants of Portland, asking that the officers and agents of said City of Portland be restrained and enjoined from establishing a municipal fuel yard and from raising by taxation the money necessary for the purpose and from carrying into effect any of the votes by the city government, or the voters to whom the question of establishing and maintaining such fuel yard was referred. The defendant demurred to the bill and the demurrer was joined. Upon a hearing in this cause, the parties agreeing thereto, the case was reported to the next Law Court at Portland. The bill of complaint and the demurrer thereto to make the report of this cause.

The case is stated in the opinion.

*Eben Winthrop Freeman,* for complainant.

*James H. McCann,* for respondent.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, PHILBROOK, JJ.

CORNISH, J. The Legislature of Maine in 1903 enacted the following law: "Any city or town is hereby authorized and empowered to establish and maintain within its limits, a permanent wood, coal and fuel yard, for the purpose of selling, at cost, wood, coal and

fuel to its inhabitants. The term 'at cost' as used herein, shall be construed as meaning without financial profit." Pub. L., 1903, c 122, R. S., ch. 4, sec. 87.

At the municipal election held in the City of Portland on December 2, 1912, the question of establishing and maintaining a fuel yard under the terms of the above act was submitted to the voters and a majority vote was cast in favor of the proposition. On February 3, 1913, both branches of the city council passed a resolution in favor of the same proposition and on February 4, 1913, this resolution was duly approved by the mayor and became effective. At the same time a special committee was appointed, consisting of the mayor, two aldermen and three councilmen "to investigate and obtain full information as to the cost of plant, machinery, rolling stock, and things whatsoever necessary to the establishment and maintaining a Municipal Fuel Yard, and carry on the business thereof, including sources from which fuel can be purchased, and prices to be paid therefor, with the duty of furnishing a full report of their findings to the City Council; and for the purpose of defraying the expense of said committee, the sum of $1,000 is hereby appropriated, the sum to be charged to special appropriation when made."

On February 4, 1913, this bill in equity was brought by fifteen taxable inhabitants of Portland, asking that the city and its officers and agents be restrained and enjoined from establishing a municipal fuel yard, from raising by taxation the money necessary for that purpose and from carrying into effect any of the votes before recited. The defendant demurred to the bill and the demurrer being joined, the case is before the Law Court on report.

The important question is therefore sharply raised, whether this court must declare unconstitutional this act of the Legislature of 1903. It is not a question whether under the general statutory powers a municipality has the right to take this step, a question that has arisen in many cases, but whether such municipality can exercise the right when conferred upon it by the Legislature in clear and unambiguous terms. In other words, is this court obliged to declare, as the plaintiffs ask us, that this act is so obviously beyond the realm of constitutional legislative action that it must be declared void.

Before considering the main issue it is necessary to restate certain familiar and yet fundamental propositions that lie at the very basis of our inquiry.

First. The Legislature has, under the constitution, "full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor that of the United States." Const. of Maine, Art. IV, Part III, sec. 1. While, therefore, the executive and the judiciary, the other two coördinate departments of government, can exercise only the powers conferred upon them by the Constitution, the powers of the Legislature are, broadly speaking, absolute, except as limited or restricted by the Constitution. "As to the executive and judiciary, the constitution measures the extent of their authority, as to the legislature it measures the limitations upon its authority." *Sawyer* v. *Gilmore,* 109 Maine, 169.

Second. The court is bound to assume that, in the passage of any law, the Legislature acted with full knowledge of all constitutional restrictions and intelligently, honestly and discriminatingly decided that they were acting within their constitutional limits and powers. That determination is not to be lightly set aside. It is not enough that the court be of the opinion that had the question been originally submitted to it for decision it might have held the contrary view. The question has been submitted in the first instance to the tribunal designated by the Constitution, the Legislature, and its decision is not to be overturned by the court unless no room is left for rational doubt. All honest and reasonable doubts are to be solved in favor of the constitutionality of the act. This healthy doctrine is recognized as the settled policy of this court. *State* v. *Doherty,* 60 Maine, 504; *State* v. *Pooler,* 105 Maine, 224. "The power of the judicial department of the government to prevent the enforcement of a legislative enactment by declaring it unconstitutional and void is attended with responsibilities so grave that its exercise is properly confined to statutes that are clearly and conclusively shown to be in conflict with the organic law. It is the duty of one department to presume that another has acted within its legitimate province until the contrary is made to appear by strong and convincing reasons." *State* v. *Rogers,* 95 Maine, 94.

"In determining the constitutionality of any legislation, all reasonable presumptions are in favor of its validity and the courts will not declare an act of the legislature to be invalid because contrary to the provisions of the organic law unless clearly so. . . . And this is as true respecting legislative enactments by which the power to exercise the right of eminent domain is delegated as in regard to any other species of legislation. The determination by the legislature that the use for which property is authorized to be taken is a public one, is, undoubtedly, subject to review by the court, but all reasonable presumptions are in favor of the validity of such determinations by the legislature, and the act must be regarded as valid unless it can be clearly shown to be in conflict with the constitution." *Ulmer* v. *R. R. Co.,* 98 Maine, 579.

With these principles conceded the precise question before the court is seen to be, whether the act in question, having been passed by the Legislature conformably with what it deemed to be an exercise of its constitutional power, can be set aside by this court as invalid on the ground that it palpably and unquestionably transcends that power. We are unable to go to that extent.

The main ground of attack is that the maintenance of what, in general terms, may be called a municipal fuel yard is not a public use, and as the power of taxation is confined to public purposes, the authority conferred by this act cannot be constitutionally exercised.

The Constitution of Maine, Art. II, sec. 21, provides that "private property shall not be taken for public uses without just compensation, nor unless the public exigencies require it." The power of taxation is akin to the right of eminent domain, because it rests upon the right of the sovereign power to appropriate the private property of its citizens to public purposes. Therefore the power of taxation must rest upon two elements in order to be permitted by the Constitution, first a public use and second a public exigency, the first to be determined, in the first instance, by the Legislature and finally by the court, if cases are brought before it raising the question, and with the limitations before referred to, and the second to be determined by the Legislature without judicial revision. *Brown* v. *Gerald,* 100 Maine, 351; *Hayford* v. *Bangor,* 102 Maine, 340.

Did then the Legislature transcend its constitutional powers when its authorized municipalities to make provision for supplying heat to its citizens? In so doing, was it clearly and unquestionably diverting the power of taxation from a public to a private purpose?

This leads us to consider what is meant by the term "public use," as employed in connection with the power to tax.

The exact line of cleavage between what is, and what is not, a public use, it is somewhat difficult to mark. Some purposes readily align themselves on one side of the line as being clearly public in their nature, while others as readily fall on the other side as being obviously private, and there is a debatable ground between the two. Thus the support of schools, the relief of paupers and the maintenance of highways are clearly public uses for which taxation is permissible and it has also been held that the maintenance of a public clock, *Willard* v. *Newburyport,* 12 Pick., 227, the purchase of a fire engine; *Allen* v. *Taunton,* 19 Pick., 485; the erection of a market house, *Spaulding* v. *Lowell,* 23 Pick., 71; the building of a memorial hall, 153 Mass., 255; the aid of a railroad, *Augusta Bank* v. *Augusta,* 49 Maine, 507; *Dyar* v. *Farmington Village Corp.,* 70 Maine, 515, all come within the scope of the same term.

On the other hand taxes cannot be imposed to aid a private enterprise, and a municipality cannot assist individuals or corporations to establish or carry on such business, either directly or indirectly, nor can it engage in such business itself. Opinion of Justices, 58 Maine, 590; *Allen* v. *Jay,* 60 Maine, 124; *Loan Assn.* v. *Topeka,* 20 Wall, 655; *Parkersburg* v. *Brown,* 106 U. S., 487; Opin. of Justices, 204 Mass., 607. If the direct object is private, the indirect benefits that may result to the public, even in a large measure, are unavailing to remedy the vital defect. *Lowell* v. *Boston,* 111 Mass., 454; Opin. of Justices, 211 Mass., 626; *Brown* v. *Gerald,* 100 Maine, 351.

The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes because it would be impossible to do so. Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary. What was clearly a public use a century ago, may, because of changed conditions, have ceased to be such today. Thus the mill act which

came into being in the early days of our parent Commonwealth of Massachusetts, and was adopted by our own State, was upheld as constitutional because of the necessities of those primitive times. The court in later days have strongly intimated that were it an original question it might be difficult to sustain it in view of present industrial conditions, *Murdock* v. *Stickney,* 8 Cush., 113; *Salisbury* v. *Forsaith,* 57 N. H., 124; *Jordan* v. *Woodward,* 40 Maine, 317.

On the other hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now. As was said in *Sun Printing & Pub. Assn.* v. *New York,* 8 App. Div., 230, affirmed in 152 N. Y., 247. 37 L. R. A., 788: "The true test is that which requires that the work shall be essentially public and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects; gain or less may incidentally follow but the purpose must be primarily to satisfy the need or contribute to the convenience of the city at large. Within that sphere of action novelty should impose no veto. Should some inventive genius bye and bye create a system for supplying us with pure air, will the representatives of the people be powerless to utilize it in the great cities of the state, however extreme the want or dangerous the delay? Will it then be said that pure air is not so important as pure water and clear light; we apprehend not."

Thus a class of public uses has grown up and been recognized within a comparatively recent time, due both to the growing needs of the community and to modern inventions calculated to meet those needs, that furnish in our judgment a logical precedent for the case at bar. These public uses or utilities, embrace water, light and heat. It is common knowledge that in the early days our citizens, even in the more populous towns and cities, obtained their water supply from private wells and cisterns. There was no public supply other than perhaps the town pump in the village square. But in course of time the private sources became both inadequate in quantity and hazardous in quality and private water companies were chartered to meet the changed demands, one of the earliest to do business on

a large scale being the Portland Water Company, chartered in 1866, Priv. and Spec. L., 1866, ch. 159. The purpose of these companies is admittedly public, *Portland* v. *Portland Water Co.,* 67 Maine, 136; *Riche* v. *Bar Harbor Water Co.,* 75 Maine, 91; *Homer* v. *Bar Harbor Water Co.,* 78 Maine, 127. "The supply of a large number of inhabitants with pure water is a public purpose," says Shaw, C. J., in *Lambard* v. *Stearns,* 4 Cush., 60.

Later the municipalities in which some of these water companies were established were given the right by the Legislature to take over and maintain these plants, or municipal water districts were formed to accomplish the same purpose. The compensation for those plants was raised by taxation or by loan, and again the purpose is obviously public, *Auburn* v. *Union Water Power Co.,* 90 Maine, 576; *Mayo* v. *Dover & Foxcroft Village Fire Co.,* 96 Maine, 539; *Kennebec Water District* v. *Waterville,* 97 Maine, 185; *Brunswick & Topsham Water District* v. *Maine Water Co.,* 99 Maine, 371; *Augusta* v. *Augusta Water District,* 101 Maine, 148.

Conditions as to lighting met with similar changes. Candles, lamps, gas and electricity have followed each other in due course of time. As late as 1890, a doubt seems to have arisen in Massachusetts as to the constitutional power of municipalities in respect to public and private lighting and the House of Representatives of that year submitted to the Justices of the Supreme Judicial Court two questions, first, whether the Legislature had the power under the Constitution to authorize the cities and towns within the commonwealth to manufacture and distribute gas or electric light for use in their public streets and buildings and second for the purpose of selling the same to its own citizens. These questions were both answered unanimously in the affirmative. The Justices in the course of their opinion say that "the extent of the right of taxation is not necessarily to be measured by that of the right of eminent domain, but the rights are analogous." So far as the lighting of the public buildings and streets are concerned the court held that it was an incident of their maintenance and tended both to common convenience and common necessity, and then these significant words are added "If the legislature can authorize cities and towns to light their streets and public buildings, it can authorize them to do this by any appro-

priate means which it may think expedient." In holding the supply to individuals to also be a public purpose, after discussing the question of water companies the Justices say: "Artificial light is not, perhaps, so absolutely necessary as water, but it is necessary for the comfortable living of every person. Although artificial light can be supplied in other ways than by the use of gas or electricity, yet the use of one or both for lighting cities and thickly settled towns is common, and has been found to be of great convenience and it is practically impossible for every individual to manufacture gas or electricity for himself. If gas or electricity is to be generally used in a city or town, it must be furnished by private companies or by the municipality, and it cannot be distributed without the use of the public streets or the exercise of the right of eminent domain. It is not necessarily an objection to a public work maintained by a city or town, that it incidentally benefits some individuals more than others, or that from the place of residence or for other reasons every inhabitant of the city or town cannot use it, if every inhabitant who is so situated that he can use it has the same right to use it as the other inhabitants. It must often be a question of kind and degree whether the promotion of the interests of many individuals in the same community constitutes a public service or not. But in general it may be said that matters which concern the welfare and convenience of all the inhabitants of a city or town, and cannot be successfully dealt with without the aid of powers derived from the Legislature, may be subjected to municipal control when the benefits received are such that each inhabitant needs them and may participate in them, and it is for the interest of each inhabitant that others as well as himself should possess and enjoy them. If the Legislature is of the opinion that the common convenience and welfare of the inhabitants of cities or towns will be promoted by conferring upon the municipalities the power of manufacturing and distributing gas or electricity for the purpose of furnishing light to their inhabitants, we think the Legislature can confer the power. We therefore answer the second question in the affirmative."

Following the reasoning of the Massachusetts court, if the lighting of private residences and buildings is a public purpose and one

which the municipality can legitimately carry on, the heating of the same buildings is equally public. It is even a greater necessity. Gas and electric lights are in the nature of luxuries, but heat is indispensable. In the regions supplied with natural gas, municipal heating from that source has been adopted, and has been held to be constitutional. *State* v. *Toledo,* 48 Ohio St., 112; 11 L. R. A., 729.

The reasoning of the court is as follows: "Heat being an agent or principle indispensable to the health, comfort and convenience of every inhabitant of our cities, we do not see why, through the medium of natural gas, it may not be as much a public service to furnish it to the citizens as to furnish water. . . . It is sufficient 'if every inhabitant who is so situated that he can use it has the same right to use it as the other inhabitants' . . . The establishment of natural gas works by municipal corporations, with the imposition of taxes to pay the cost thereof, may be a new object of municipal policy, but in deciding whether in a given case the object for which taxes are assessed is a public or private purpose, we cannot leave out of view the progress of society, the change of manners and customs, and the development and growth of new wants, natural and artificial, which may from time to time call for a new exercise of legislative power. And in deciding whether such taxes shall be levied for the new purposes that have arisen, we should not, we think, be bound by an inexorable rule that would embrace only those objects for which taxes have been customarily and by long course of legislation levied."

If, then, science had advanced so far that the heating as well as the lighting of houses by electricity were now a practicable method, there would seem to be no doubt that this also would fall within the realm of public purposes. The heat would be conducted from the central power station by means of wires along or under the public streets, the same as light is now. Or suppose it were practicable to install a central heating plant and conduct the heat through pipes in the streets to the various buildings, much the same as water or gas is now conducted, we see no reason why this too should not be called a public use.

Just here, however, the petitioners contend for a distinction between all these illustrations and the case at bar. They say that in

the case of the distribution of water, and of light and heat by gas or electricity, the use of the public highways is required for the mains and the poles and wires, that the purpose is public because it is necessary to obtain permission from public authorities, either state or municipal in order to carry it out. We grant that in those cases this element of public permission exists, but it does not follow that the converse is true and that no purpose is public, where such permission does not exist. How can this criterion be applied to the erection of public buildings, the erection of a park, the building of a memorial hall, or of a market house, or the maintenance of a public clock? In other words under this rule, public service of this sort would be limited to one which can only be performed by a so called public service corporation and not by an individual or corporation, independent of chartered rights. This is, in our judgment, too narrow. It makes an incident to some forms of public service an essential element. It transforms the method or means of rendering the service into the essence of the service itself. It makes the exercise of public rights in supplying the necessities of a community a prerequisite to the public use. But this exercise of public rights can itself be authorized only by the Legislature and if that branch of the government sees fit to bestow the public service in a manner that may obviate the use of the public right they certainly should have the right and the power so to do. It is a matter within their control.

Let us look at the question from a practical and concrete standpoint. Can it make any real and vital difference and convert a public into a private use if instead of burning the fuel at the power station to produce the electricity, or at the central heating plant to produce the heat and then conducting it in the one case by wires and in the other by pipes to the user's home, the coal itself is hauled over the same highway to the same point of distribution? We fail to see it. It is only a different and a simpler mode of distribution and, if the Legislature has the power to authorize municipalities to furnish heat to its inhabitants "it can do this by any appropriate means which it may think expedient." The vital and essential element is the character of the service rendered and not the means by which it is rendered. It seems illogical to hold that a

municipality may relieve its citizens from the rigor of cold if it can reach them by pipes or wires placed under or above the highways but not if it can reach them by teams travelling along the identically same highway. It will be something of a task to convince the ordinarily intelligent citizen that an act of the Legislature authorizing the former is constitutional but one authorizing the latter is unconstitutional beyond all rational doubt. For we must remember that we are considering the existence of the power in the Legislature which is the only question before the court and not the wisdom of its exercise which is for the Legislature alone.

Cases directly in point are lacking. We have been unable to find anywhere that the issue has been squarely decided.

The learned counsel for the plaintiffs confidently rely upon the opinions of the Justices in 155 Mass., 598 and 182 Mass., 605, rendered in answer to questions propounded by the House of Representatives as to the constitutionality of proposed acts for the establishment of municipal fuel yards. While such answers are entitled to great consideration they do not have the force of decision. Kent, J., 58 Maine, 573, Tapley, J., 58 Maine, 615, and Libbey, J., 72 Maine, 562-3, "The giving of advisory opinions is not the exercise of the judicial function at all, and the opinions thus given have not the quality of judicial authority." Prof. James B. Thayer, 7 Harv. Law Rev., p. 153.

In 155 Mass., 598, the Justices were divided, five advising that the proposed act would be unconstitutional, one, Justice Holmes, that it would be constitutional, and one, Justice Barker, giving a qualified assent to its validity. In 182 Mass., 605, the opinions of the majority in 155 Mass., were adopted without dissent, and these views have been reaffirmed by way of illustration in Opin. of Justices, 211 Mass., 624, the subject matter of that opinion being the power of municipalities to construct houses in the suburbs for wage earners, a power clearly not theirs. A careful study of these opinions shows that the general principles enunciated are in accord with our own views and that in only one particular are we at variance.

The conclusions reached by the majority in the Massachusetts cases seem to be:

(1) That it is beyond the power of a municipal corporation to engage in the sale of commodities which are and can be easily conducted by private business concerns in competition with one another, and which can be sufficiently regulated thereby.   In this we most heartily concur.

(2) That the sale of fuel falls within this class of commodities and there is no necessity why cities and towns should undertake this form of business any more than many others which have always been conducted by private enterprizes.   Here we differ.

(3) . That in regard to "a condition in which the supply of fuel would be so small and the difficulty of obtaining it so great, that persons desiring to purchase it would be unable to supply themselves through private enterprises it is conceivable that agencies of government might be able to obtain fuel when citizens generally could not.   Under such circumstances we are of opinion that the government might constitute itself an agent for the relief of the community, and that money expended for the purpose would be expended for a public use."   Here again we concur.

The principle, therefore, seems to be conceded that if the difficulty of obtaining an adequate supply exists, the furnishing of such supply by municipalities would be a public use.   And this is the construction placed upon the Massachusetts opinion by learned text writers.   Dillon Mun. Corp. 5th ed., sec. 1292.   McQuillan Mun. Corp. (1912) sec. 1809.

In the last analysis this differs but little from the definition of a public use laid down by Judge Cooley in his work on Constitutional Limitations, 6th ed., p. 655, viz.: "That only can be considered a public use where the government is supplying its own needs or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare which on account of their peculiar character and the difficulty—perhaps impossibility —of making provisions for them otherwise, is alike proper, useful and needful for the government to provide."   This court in discussing the question of public uses with reference to the power of eminent domain adopted this definition in a very recent case, remarking "there is perhaps no general definition more satisfactory than this one."   *Brown* v. *Gerald,* 100 Maine, 351, 370.   And this

general definition we adhere to and seek to apply in the case at bar. Its two tests are: first, the subject matter, or commodity, must be one "of public necessity, convenience or welfare." Fuel clearly comes within this category. The second test is the difficulty which individuals have in providing it for themselves. The causes creating the difficulty may vary, but if the difficulty exists, the test is met. For instance, in the case of a water supply the difficulty arises from the fact that individual sources are inadequate or unsanitary and the conditions can be remedied only by the municipality itself providing or allowing some public service corporation to furnish the community at large from a single and common source. This is a matter of common knowledge and the court in passing upon the question of public use cannot ignore it.

In the case of fuel the practical difficulty is caused by the existence of monopolistic combinations. The mining, transportation and distribution of coal, has, in the process of industrial development, fallen into the hands of these combinations to such an extent that the greater part of the supply is in the absolute control of a few. The difficulty and practical impossibility of obtaining an adequate supply for private needs at times in the past, and the consequent suffering among the people, especially in the more populous cities, are matters of history, and this difficulty may as well be caused by unreasonable prices as by shortage in quantity. All this is a matter of common knowledge and cannot be overlooked by the court. The supply of water may be inadequate from one cause, that of fuel from another, but out of each arises the condition which renders the furnishing of it by the municipality a public use.

The majority of the Massachusetts Justices conceded the right to create municipal fuel yards under certain conditions and exigencies, but say that in their opinion fuel is like all other commodities of ordinary purchase and sale in the open market and there is no necessity why cities and towns should undertake that form of business any more than many others which have always been conducted by private enterprise. This might seem to be invading the province of the Legislature, because the determination of the exigency is for that coördinate branch of the government alone, and by the passage of this act that branch has necessarily determined that the exigency exists. If, however, independent of their finding the court has a

right to consider all the conditions and circumstances connected with the subject matter, all the elements which, under the definition of Judge Cooley, make up the public use, then we cannot close our eyes to existing economic conditions and must admit that in determining the existence of the difficulty the finding of the Legislature is not wrong beyond all rational doubt, and therefore under the well settled rules of constitutional construction it should not be disturbed.

But it is urged, why, if a city can establish a municipal fuel yard, can it not enter upon any kind of commercial business, and carry on a grocery store, or a meat market or a bakery. The answer has been already indicated. Such kinds of business do not measure up to either of the accepted tests. When we speak of fuel, we are dealing not with ordinary articles of merchandise for which there may be many substitutes, but with an indispensable necessity of life, and more than this, the commodities mentioned are admittedly under present economic conditions regulated by competition in the ordinary channels of private business enterprise. The principle that municipalities can neither invade private liberty nor encroach upon the field of private enterprise should be strictly maintained as it is one of the main foundations of our prosperity and success. If the case at bar clearly violated that principle it would be our duty to pronounce the act unconstitutional, but in our opinion it does not. The element of commercial enterprise is entirely lacking. The purpose of the act is neither to embark in business for the sake of direct profits (the act provides that fuel shall be furnished at cost) nor for the sake of the indirect gains that may result to purchasers through reduction in price by governmental competition. It is simply to enable the citizens to be supplied with something which is a necessity in its absolute sense to the enjoyment of life and health, which could otherwise be obtained with great difficulty and at times perhaps not at all, and whose absence would endanger the community as a whole. In our opinion it is a proper and constitutional function of government either to itself provide such a necessity under these circumstances or to see to it that it is so provided as to bring it within the reach of the citizens.

A similar inquiry based upon fears for the future was asked as to the limit of legislative power in *Olmstead* v. *Camp,* 33 Conn., 532, and is there answered by the court in these words: "The question is asked with great pertinence and propriety, what then is the limit of legislative power under the clause which we have been considering and what is the exact line between public and private uses? Our reply is that which has heretofore been quoted. From the nature of the case there can be no precise line. The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society. The sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts." This furnishes, we think, a safe and sufficient barrier between the Constitution and those who might attempt to break it down.

Nor is the fact that in operation the act may tend to lessen the profits of a few private dealers or even force them from business, a matter of consideration for the court. "It is for the legislature to determine from time to time what laws and regulations are necessary or expedient for the defence and benefit of the people, and however inconvenienced, restricted or even damaged, particular persons and corporations may be, such general laws and regulations are held valid unless there can be pointed out, some provision in the State or United States Constitution, which clearly prohibits them." Opinion of Justices, 103 Maine, 506.

The brief opinion of Mr. Justice Holmes now of the Supreme Court of the United States, in 155 Mass., 607 supra, goes even farther than the rule which we have laid down. He says: "I am of opinion that when money is taken to enable a public body to offer to the public without discrimination an article of general necessity the purpose is no less public when that article is wood or coal than when it is water or gas or electricity or education, to say nothing of cases like the support of paupers or the taking of land for railroads or public markets. I see no ground for denying the power of the Legislature to enact the laws mentioned in the questions proposed. The need or expediency of such legislation is not for us to consider."

Our attention is further called by the plaintiffs to *Baker* v. *Grand Rapids,* 142 Mich., 687, 106 N. W., 208, but that case has no bearing upon the question at issue. There, the city government without authority from the Legislature transferred $10,000 from the contingent fund to the poor fund for the purchase and distribution of coal when the price of coal was rapidly rising and a combination had been formed to exist among the local dealers. A bill in equity was brought by one of these dealers to prevent the action, and was held not to be maintainable, first because the plaintiff being engaged in the unlawful combination did not come into court with clean hands, second because the act had already been done and the city had ceased to carry on the business, and third because the plaintiff was not damaged. This case certainly furnishes no authority for the plaintiffs; and no others in point have been cited.

On the other hand the very recent case of *Holton* v. *Camilla,* 134 Ga., 560, 68 N. E., 472, 31 L. R. A. N. S., 116 (1910), cited by the defendant is an important precedent by analogy. In that case the court held constitutional a legislative act authorizing the city to establish and maintain a municipal ice plant in connection with its water works. In discussing the question of public use after referring to water, light and heat, the court says:

"If a city has the right to furnish heat to its inhabitants, because conducive to their health, comfort and convenience, we see no reason why they should not be permitted to furnish ice. . . . Is the difference between water in a liquid and in a frozen condition a radical one? Upon what principle could the doctrine rest that liquid water may be delivered by the city to its inhabitants by flowage through pipes, but that water in frozen blocks cannot be delivered by wagons or otherwise? If the city has the right to furnish its inhabitants with water in a liquid form, we fail to see any reason why it cannot furnish it to them in a frozen condition. . . . If the furnishing of ice to its inhabitants is conducive generally to their health, comfort and convenience it is certainly being furnished for a municipal or public purpose." It requires no argument to prove that coal is as conducive to the health, comfort and convenience of the inhabitants of this northern latitude as is ice to that of the inhabitants of Georgia.

Without discussing the question further it is sufficient to say that

we see in this act of the Legislature a sign neither of paternalism nor of socialism. We do not regard it as a departure from previous legislation but in line with it, although perhaps one step further. The direction however is the same and the advance is caused by the development of a new want which has called for a new exercise of legislative power, not an exercise of new legislative power, and such an advance is both legitimate and commendable.

Our conclusion, therefore, is that the acts threatened by the defendant are not an invasion of the constitutional rights of the plaintiffs and that the plaintiffs are not entitled to a perpetual injunction as prayed for.

*Bill dismissed with costs.*