Argued December 20, 1916, reversed January 16, 1917.

STEVENSON *v.* PORT OF PORTLAND.*

(162 Pac. 509.)

**Municipal Corporations—Port—Powers—Coaling Ships—Statutes.**

1. Laws of 1901, page 417, reproduced in Sections 6076–6105, L. O. L., Revised Laws of 1891, page 791, establishing and incorporating the Port of Portland, and declared the object of the port to be "to promote the maritime shipping and commercial interests of the Port of Portland," provided for the improvement of certain rivers in the port, and between it and the sea, by a ship canal to the sea, and conferred the right of eminent domain, taxation and the right to make regulations, and to own and operate a dry-dock. In 1908 the legal voters initiated and adopted a measure, attempting to confer the additional power of coaling or bunkering ships, under which the port proposed to purchase a site, erect coal-bunkers, and maintain a supply of coal, the expenses of which were to be raised by taxes, to meet the competition of Puget Sound ports, where coal could be obtained for less than in Portland, and thereby overcome such disad-, vantage and retain and increase its ocean commerce. *Held*, in view of the object of such legislation, that the coaling or bunkering of ships would be incidental to the public purpose for which the port was created, and would be itself a public purpose, which might be conferred by the legislature.

**Taxation—Private Purpose.**

2. No tax can be imposed for a private purpose.

**Taxation—Subject—"Public Purpose."**

3. The "public purpose" for which the government may levy taxes is one which concerns its own people, and not some other people having a government of its own, for whose wants taxes are laid, and must pertain to the sovereignty with which the tax originates; the

---

*On the right of municipal corporation to engage in private enterprise generally regarded as of private character, see note in 31 L. R. A. (N. S.) 119.

For authorities passing on the question as to what are public purposes for which money may be raised by taxation, see note in 14 L. R. A. 474.        REPORTER.

essential requisite being that a public service or use shall affect the inhabitants as a community, and not merely as individuals.

[As to purposes for which a municipal corporation may levy taxes and assessments, see note in 16 Am. St. Rep. 365.]

Taxation—Public Purpose—Custom and Usage.

4. Custom and usage may be important factors in determining whether a tax is for a public or private purpose; but, while recognizing the influence of customs and usages already established, the courts are mindful of the fact that new customs and usages may prevail, and that conditions may change, so that a purpose, formerly private, may become public.

Municipal Corporations — Port — Powers — Amendment to Charter— Coaling Ships.

5. Under Laws of 1901, page 417, reproduced in Sections 6076–6105, L. O. L., revising Laws of 1891, page 791, incorporating the municipality of the Port of Portland without the right to coal ships, the voters thereof could not, without legislative aid, constitutionally initiate and adopt a measure authorizing the port to coal ships.

From Multnomah: GEORGE N. DAVIS, Judge.

In Banc. Statement by MR. JUSTICE HARRIS.

This is a suit by John H. Stevenson against the Port of Portland, a municipal corporation, and R. D. Inman, J. W. Shaver, D. C. O'Reilly, A. L. Pease, W. H. Patterson, E. W. Spencer and Alfred Tucker, board of commissioners. The facts are as follows:

The Port of Portland plans to erect and maintain coal-bunkers and to supply ships with coal; and the plaintiff, who is a taxpayer, sued to enjoin the defendant from carrying out its plans. The trial court dismissed the suit when the plaintiff declined to plead further after a demurrer to the answer had been overruled, and consequently the appeal presents a record consisting only of a complaint and answer. The complaint alleges that the venture about to be entered into by the port is private in its nature, and that therefore moneys collected by taxation and used in supplying coal to ships would be used for a private, and not a public, purpose.

The answer avers that the defendant was organized for the purpose of promoting the maritime shipping and commercial interests of the Port of Portland, and, to accomplish that general purpose, it is empowered to coal ships. The pleading alleges that the early growth of the Port of Portland occurred during a time when most of the water transportation was done by sailing vessels, but of late years they have been more and more displaced by steamships, so that now by far the greater part of the sea-going trade is done with steamships, which, other conditions being equal, naturally seek those ports where suitable bunker coal can be obtained most readily and most cheaply. Continuing, the answer alleges:

"No suitable bunker coal is produced by any mines in the vicinity of Portland. A somewhat inferior grade of bunker coal is produced on the Puget Sound, and some of it is furnished to steamers entering Puget Sound ports, but the best bunker coal produced on the North Pacific Coast comes from the north coast of Vancouver Island, British Columbia, and one of the best grades of this Vancouver coal is known as Comox coal. This Comox coal can be purchased at the Comox mines at an average price of $4.25 per ton, and it is sold to steamers at Puget Sound ports at an average price of $4.75 a ton, which enables steamers of Puget Sound ports to obtain this coal at an average price of $1.00 or $1.50 a ton less than they can obtain it in the Port of Portland, when they can obtain it at all in the last-mentioned port, and there are many times when in the Port of Portland there is no Comox coal or any other suitable bunker coal on the market at all. Under the existing conditions a steamer coming to the Port of Portland, whether a tramp or a regular liner, has to either pay an extra price for coal here, or proceed to the north coast of Vancouver Island to fill her bunkers there with suitable coal at a reasonable price."

The defendant says that competing ports have been increasing their ocean trade while the business of the Port of Portland has been diminishing, and that this condition will continue to exist and the present disadvantage to the defendant cannot be remedied unless. it is permitted to supply ships entering this port with good bunker coal at the same price similar coal is furnished on Puget Sound. The Port of Portland ''has spent years of effort and millions of dollars in dredging a channel from Portland to the sea, and that channel is now better than it has ever been before, and has 30 feet of water in its shallowest part; and yet these fine facilities for commerce are not bearing the fruits that they should, and the tremendous investment therein is in danger of depreciation because of the successful competition of the Puget Sound ports, one of the elements of which is their more favorable coaling facilities, as above described.''

REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. M. E. Crumpacker.*

For respondents there was a brief over the name of *Messrs. Wood, Montague, Hunt & Cookingham,* with oral arguments by *Mr. Erskine Wood* and *Mr. Richard W. Montague.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1. The plaintiff contends that when the Port of Portland supplies vessels with coal, it conducts a private competitive business, while the defendant argues that under all the surrounding circumstances it accomplishes a public rather than a private purpose when

it furnishes coal to steamships. The Port of Portland is not claiming that it has a right to exist for the sole purpose of selling coal as a business, but it does insist that there is no constitutional inhibition against granting power to it to furnish coal to ships when that power is considered in connection with the object for which the port was created. In view of the position taken by the defendant, it becomes necessary to refer to the history of the creation and development of the port as we read it in the complaint and answer and in the various legislative enactments.

The Port of Portland was established and incorporated in 1891 by an act of the legislative assembly, in order to provide for the improvement of the Willamette and Columbia Rivers in the port and between the port and the sea, the declared object being to make and maintain a ship channel to the sea of not less than 25 feet in depth: Laws 1891, p. 791. So far as necessary to carry out the object of the corporation, the port was granted full control of the rivers "so far and to the full extent that this state can grant the same," was empowered to exercise the right of eminent domain to do whatever "may be found necessary or convenient in creating or maintaining the channel" at a depth of 25 feet, and to levy and collect taxes upon all taxable property within its boundaries. In 1899 the authority of the port was enlarged, so that among other things it could make certain rules and regulations: Laws 1899, p. 146. All prior legislation was supplanted by the legislative act of 1901 found on page 417, Laws of 1901, and reproduced in Sections 6076 to 6105, L. O. L., inclusive. By this enactment it is declared that the object of the port is "to promote the maritime shipping and commercial interests of the Port of Portland," the authority of the defendant was

again enlarged, and in addition to the rights conferred upon it by previous legislation it was granted other powers among which was the right to erect, own and operate a dry dock, and adequate provision was made for the levying of taxes to defray the expense of the drydock, dredges and work done by the port.    In 1908 the legal voters of the port initiated and adopted a measure which provided for the operation of steam tugboats and steam and sail pilot boats, and in 1912 the voters initiated, and a majority voted for, a proposed amendment, which attempts to confer the added power of furnishing ships with coal.

The ultimate aim of all the legislation which has been enacted concerning the Port of Portland is to promote the maritime shipping and commercial interests of the port within whose boundaries is located the City of Portland, the metropolis of the state, and this aim is accomplished by maintaining a ship channel of sufficient depth between Portland and the sea so that ocean-going vessels may enter and discharge cargoes brought from other ports and here receive the grain and timber which contribute in such large measure to the welfare, happiness and prosperity, not only of the Port of Portland, but also of the entire state.    The maintenance of an adequate ship channel from Portland to the sea is necessary for the continued well-being of the Port of Portland; and, moreover, a failure to maintain an open channel for sea-going vessels would directly or indirectly affect the entire state.    A mere statement of the objects for which the corporation was organized is a demonstration of the fact that it was created for a public purpose.    Indeed, the plaintiff concedes that dredging and maintaining a sufficient waterway to the sea is doing a public work, but he does question the right of the port to sell coal to ships.

2. The defendant proposes to purchase a site and erect coal-bunkers and maintain a supply of suitable coal for sale to ships, and the expenses of the business would necessarily be paid out of funds raised by taxes. No tax can be imposed for a private purpose, and therefore the port cannot engage in selling coal to ships unless it is promoting a public purpose: *People v. Salem,* 20 Mich. 452, 474 (4 Am. Rep. 400); *Loan Assn.* v. *Topeka,* 20 Wall. 655 (22 L. Ed. 455); Cooley, Taxation (2 ed.), 103; 2 Dillon, Mun. Corp. 1363; 28 Cyc. 1663; 37 Cyc. 719; Gray, Lim. of Taxing Power, § 169.

A clear and definite line of distinction cannot be drawn between purposes of a public and those of a private nature, and it is perhaps impossible to enumerate all the characteristics which distinguish a public from a private purpose: Cooley, Taxation (2 ed.), 106; *Opinion of the Justices,* 150 Mass. 592 (24 N. E. 1084, 8 L. R. A. 487); *State ex rel.* v. *Lynch,* 88 Ohio St. 71 (102 N. E. 670, Ann. Cas. 1914D, 949, 48 L. R. A. (N. S.) 720); *Opinion of the Justices,* 155 Mass. 601 (30 N. E. 1142, 15 L. R. A. 809); *Laughlin* v. *Portland,* 111 Me. 486 (90 Atl. 318, Ann. Cas. 1916C, 734, 51 L. R. A. (N. S.) 1143).

3. It has been said that the "public purpose" for which a government may levy taxes "is one which concerns its own people, and not some other people having a government of its own, for whose wants taxes are laid"; and "the purpose must, in every instance, pertain to the sovereignty with which the tax originates": Cooley, Taxation (2 ed.), 108. Quoting from *Opinion of the Justices,* 150 Mass. 592 (24 N. E. 1084, 8 L. R. A. 487):

"The essential point is that a public service, or use affects the inhabitants 'as a community, and not merely as individuals.' "

The Supreme Court of New York has held that:

"The true test is that which requires that the work should be essentially public, and for the general good of all the inhabitants of the" government or subdivision of government: *Sun Printing Assn.* v. *Mayor*, 8 App. Div. 230 (40 N. Y. Supp. 607), affirmed in 152 N. Y. 257 (46 N. E. 499, 37 L. R. A. 788).

Judge Cooley is authority for the statement that:

"The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such when the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide": Cooley, Const. Lim. (6 ed.), p. 655.

The Supreme Court of the United States announced in the much cited case of *Loan Assn.* v. *Topeka,* 20 Wall. 655 (22 L. Ed. 455), that:

"It is undoubtedly the duty of the legislature which imposes, or authorizes municipalities to impose, a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper

for the maintenance of good government, though this may not be the only criterion of rightful taxation'': Gray, Lim. of Taxing Power, § 176; *Union Ice & Coal Co.* v. *Town of Ruston,* 135 La. 898 (66 South. 262, Ann. Cas. 1916C, 1274, L. R. A. 1915B, 859).

4. Custom and usage may be important factors in determining whether a tax is for a public or private purpose; but, while recognizing the influence of cus- toms and usages already established, the courts are mindful of the fact that new customs may be formed and new usages may prevail, and that conditions may change as time advances, so that a purpose which was concededly private a decade ago may now be public and so, too, those which to-day are admittedly private purposes, to-morrow may be public in their nature: *Sun Printing Assn.* v. *Mayor,* 8 App. Div. 230 (40 N. Y. Supp. 607); *State ex rel.* v. *Lynch,* 88 Ohio St. 71 (102 N. E. 670, Ann. Cas. 1914D, 949, 48 L. R. A. (N. S.) 720); *Laughlin* v. *Portland,* 111 Me. 486 (90 Atl. 318, Ann. Cas. 1916C, 734, 51 L. R. A. (N. S.) 1143); *Holton* v. *Camilla,* 134 Ga. 560 (68 S. E. 472, 20 Ann. Cas. 199, 31 L. R. A. (N. S.) 116); *State ex rel. Attorney General* v. *Toledo,* 48 Ohio St. 112 (26 N. E. 1061, 11 L. R. A. 729); 27 Harvard Law Review, 162; 1 Dillon, Mun. Corp. (5 ed.), § 21.

The history of the Port of Portland furnishes an example of material changes wrought within a com- paratively few years. When the corporation was created most of the incoming and outgoing ocean trade of Portland was carried in sailing vessels, but now con- ditions are reversed, and steamships carry the bulk of the commerce. Every power which from time to time has been conferred upon the Port of Portland has been granted in order to further the basal and fundamental objects for which the defendant was created. Cloth-

ing the Port of Portland with the power to sell coal
to ships would, under the conditions confronting the
defendant, only be granting the right to exercise an
additional power in aid and in furtherance of the ele-
mental purposes for which the port exists.   The power
to sell coal to ships would only be accessorial to the
definite public purpose for which the port was created.
Exercise of the additional power would tend to pre-
serve the health of the corporate body to the benefit
and advantage of all the people within the boundaries
of the port, and hence would be so intimately related
to the object for which the defendant was created and
would be so essential for the future well-being of the
port that this added power, when employed in further-
ance of the prime object of the defendant, itself takes
on the characteristics of a public purpose.   Under all
the circumstances, the sale of coal to ships would con-
cern all the people of the port; it would affect the in-
habitants as a community, and not merely as individ-
uals, and it would be for the general good of all the
inhabitants of the port: *The George W. Elder* (D. C.),
159 Fed. 1005; *Farrell* v. *Port of Portland,* 52 Or. 582,
590 (98 Pac. 145).

Even though the defendant may not be governed by
the enactment, it is nevertheless worth noting that the
legislature has adjudged that selling coal to ships by
ports organized under the general law of 1909 is exer-
cising a power for a public purpose: Laws 1915, p. 62,
amending Section 6121, L. O. L.

5. Thus far the inquiry has been directed to a con-
sideration of the question of whether or not the port
would be carrying out a private or a public purpose
if it exercised the power to sell coal to ships, and it
now becomes necessary to ascertain whether the de-
fendant does possess that power.   The legislature has

not granted the Port of Portland the right to sell coal; and, moreover, it appears from paragraph 3 of the complaint, and it is admitted by the answer, that the defendant proposes to act under the authority of a purported amendment to the charter or act of incorporation attempted to be passed by the voters of the port at the general election held in November, 1912. The voters of a port, however, cannot, without legislative aid, constitutionally amend their charter or act of incorporation, and since they cannot amend their charter, and neither the legislature nor the people of the whole state have conferred the power to sell coal, the defendant is as yet powerless to engage in that business: *State ex rel.* v. *Port of Astoria,* 79 Or. 1 (154 Pac. 399); *Rose* v. *Port of Portland, ante,* p. 541 (162 Pac. 498). The legislative assembly possesses ample authority to permit ports to sell coal; and the exercise of that authority, when properly granted, and used in aid of the fundamental objects of a port, is the employment of a power for a public use. The defendant can sell coal to ships whenever the legislature or the voters of the state at large grant that right, but the defendant cannot engage in the coal business until it receives proper authority. The demurrer to the separate defense set forth in the answer should have been sustained. The decree is reversed, and the cause is remanded for such further proceedings as may not be inconsistent with this opinion.

REVERSED AND REMANDED.