(66 South. 262)

No. 19895.

UNION ICE & COAL CO. v. TOWN OF RUSTON.

(May 25, 1914.   Rehearing Denied Oct. 20, 1914.)

*(Syllabus by Editorial Staff.)*

1. TAXATION (§ 22*)—POWER OF STATE LEGISLATURE—LIMITATIONS.

In addition to the limitations on the Legislature of a state contained in the federal and state Constitutions, the Legislature is further subject in the passage of legislation to the limitations which inhere in the nature of our form of government, such as that the power of taxation can be validly exercised only for a public purpose, etc.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 55, 58; Dec. Dig. § 22.*]

2. TAXATION (§ 38*)—TAXING POWER—PUBLIC UTILITIES — MUNICIPAL ICE PLANT — POWER TO MAINTAIN—"STRICT"—"STRICTLY PUBLIC."

Const. art. 224, provides that the taxing power may be exercised by the General Assembly for state purposes and by parishes and municipal corporations and public boards, under authority delegated by the General Assembly for parish, municipal, and local purposes "strictly" public in their nature. *Held*, that the word "strict" was used in the sense of exact; accurate; precise; undeviating; governed or governing by exact rules; and "strictly" as in a strict manner; closely, precisely, rigorously; stringently; positively; and that the construction and maintenance of a municipal ice plant by a small city operating a municipal waterworks and electric lighting system was not "strictly" a public activity, and could not be maintained by the exercise of the taxing power.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 67; Dec. Dig. § 38.*

For other definitions, see Words and Phrases, Strict.]

3. TAXATION (§ 22*)—"PUBLIC SERVICE."

The term "public service," within the rule that taxes can be laid only for public purposes, is not fulfilled by an activity whereby the private interests of many individuals are fulfilled; the test in general being whether the objects

or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 55, 58; Dec. Dig. § 22.*

For other definitions, see Words and Phrases, First and Second Series, Public Service.]

4. CONSTITUTIONAL LAW (§ 81*) — "POLICE POWER."

The term "police power" has a meaning coextensive with sovereign power or sovereignty. As understood in American constitutional law, the term denotes the power of the state to impose those restraints on private rights which are necessary for the general welfare of all, and is but the power to enforce the maxim, "Sic utere tuo ut alienum non lædas." It is the power to regulate the business of others, and not a power to go into business.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 148; Dec. Dig. § 81.*

For other definitions, see Words and Phrases, First and Second Series, Police Power.]

Appeal from Fourth District Court, Parish of Lincoln; J. B. Holstead, Judge.

Suit by the Union Ice & Coal Company against the Town of Ruston, to annul an ordinance providing for the purchase, installation, and operation of a municipal ice plant. From a judgment denying such relief, complainant appeals. Reversed and rendered.

Barksdale & Barksdale, of Ruston, for appellant. S. D. Pearce and F. W. Price, both of Ruston, for appellee.

PROVOSTY, J. The town council of the town of Ruston having adopted an ordinance providing for the purchase and installation of an ice manufacturing plant, to be operated in connection with its water and electric light plant for the production of ice to be sold to the inhabitants of the town, the plaintiff company, and ice-manufacturing company, which had theretofore been furnishing ice to the town, brought this suit, in its quality of a taxpayer, to annul the ordinance, and enjoin its execution.

The ordinance is said by plaintiff to contravene articles 46, 58, 227, 263, 270, and 287 of the state Constitution; but, while these grounds are not waived in the argument, they are evidently not insisted on with any great confidence in their merit. The main ground, to which the bulk of the brief of plaintiff is devoted, and to which we shall confine ourselves, is that the cost of said ice-manufacturing plant is proposed to be paid in part out of revenues derived from taxation; and that the power of taxation can be exercised only for public purposes; and that the manufacturing of ice by a town for sale to the inhabitants of the town is not a public purpose.

Act No. 3, p. 128, of 1912, amending act No. 136 of 1898, provides as follows:

"The mayor and board of aldermen of every city and town owning, maintaining and operating either municipal waterworks or electric light system or both shall have the additional power to install, own, maintain and operate in connection with such system, an ice-making plant for the purpose of supplying its inhabitants with ice, and to prescribe the rates at which ice shall be supplied to its inhabitants."

There is no question, therefore, but that the town had authority to adopt said ordinance, if the conferring of such authority was within the power of the Legislature.

[1, 2] As we understand the argument of the learned counsel for the defendant, it is that the Legislature "may do everything which the state Constitution does not prohibit." This is not true. In addition to the limitations contained in the federal and state Constitutions, there are those limitations which inhere in the nature of our form of government; such as that the power of taxation can be validly exercised only for a public purpose. But, for finding this particular limitation, it is not necessary, in this state, to go outside of the Constitution, for its article 224 provides as follows:

"Art. 224. The taxing power may be exercised by the General Assembly for state purposes and by parishes and municipal corporations and public boards, under authority granted to them by the General Assembly, for parish, municipal, and local purposes, strictly public in their nature."

The several Constitutions of this state prior to that of 1879 contained no restriction upon the taxation power except those of equality and uniformity. The Constitution of 1879 contained many restrictions. The Constitution of 1898 retained them, and added to them this one, that the power should be exercised by municipalities only for purposes "strictly public in their nature."

Our question is, therefore, whether the establishment and operation of an ice plant for making ice to be sold to the townspeople is a "purpose strictly public in its nature."

It may be well to premise that, in a case such as this, where a municipality is about to contract for an expenditure that will have to be met, in whole or in part, by taxation, the taxpayer who, like the plaintiff in this case, intends to resist the tax, does not have to wait until the tax has been actually imposed, or until his property is being seized to satisfy it, but that he may attack the ordinance itself which authorizes the expenditure to be incurred; indeed, that that is the proper course for him to pursue. As said by the Supreme Court of the United States in Loan Association v. Topeka, 20 Wall. 655, 660, 22 L. Ed. 455–460:

"The validity of a contract which can only be fulfilled by a resort to taxation depends on the power to levy the tax for that purpose."

So well settled is this that the learned counsel for defendant have not made any point in that connection. See A. & E. E. of L. vol. 20, p. 1084.

As indicating the public nature of such an enterprise, the learned counsel for defendant adduce the fact (not supported, by the way, by any evidence in the case) that the United States government has established ice plants of this kind for supplying its own needs, not for sale; and that the city of New York is meditating a like undertaking. But, we imagine, no one would contest the right of the town of Ruston to do this same thing if the town were of proper size for such a thing. But Ruston is not a city, nor even a very large town.

The engineer in charge of the town electric light plant testified that an ice plant could be operated very economically in connection with the electric light plant, because it would be run during the day, when the load is off of the electric light plant, and therefore with the same engine and, to some extent, by the same employés, and with no great addition of fuel. But the question in such cases is not whether the thing can be done economically or not, but whether the doing of it falls within the legitimate functions of municipal government. The fact that shoes and ready-made clothing could be manufactured more cheaply by the municipality in connection with its public utilities would not justify the town in going into the shoes and clothes business.

We do not wish to be understood, however, as placing shoes and clothes on a parity with ice in connection with the possibility of their production being, or becoming, a municipal function. While both are to-day on a parity as articles of commerce, there is this difference between them: That the bulkiness of ice renders its being produced locally of greater necessity than is the case with shoes or clothes. Water and light may be—indeed, are—articles of commerce in towns unprovided with the modern facilities for furnishing both to the inhabitants more conveniently and economically; but the furnishing of them to the inhabitants of a town is now a well-recognized municipal function. Whether, if it were shown that ice can be produced so cheaply in connection with a town electric light plant as to be classable almost as a by-product, and, as such, be furnished to the inhabitants of the town with incomparably greater convenience and cheapness than by the ordinary mode, a case would not be presented to which the same reasons would in a

measure be applicable which justify the furnishing of water and light as municipal functions, we will not undertake to say. Such proof has not been made. Defendant's engineer has merely shown that the production under those conditions would be cheaper; and he admits that he is no expert in the matter, and that much of such information as he possesses on the subject has been derived from interested sources—from sellers of ice-making machinery.

On the question of what is a public purpose many illuminating passages are to be found in the decisions, from among which we select a few:

In People v. Salem, 20 Mich. 452, 4 Am. Rep. 400, Judge Cooley, speaking for the Supreme Court of Michigan, said:

"But when we examine the power of taxation with a view to ascertain the purposes for which burdens may be imposed upon the public, we perceive at once that necessity is not the governing consideration, and that in many cases it has little or nothing to do with the question presented. Certain objects must of necessity be provided for under this power, but in regard to innumerable other objects for which the state imposes taxes upon its citizens, the question is always one of mere policy, and if the taxes are imposed, it is not because it is absolutely necessary that those objects should be accomplished, but because, on the whole, it is deemed best by the public authorities that they should be. On the other hand, certain things of absolute necessity to civilized society the state is precluded, either by express constitutional provisions or by necessary implication, from providing for at all; and they are left wholly to the fostering care of private enterprise and private liberality. We concede, for instance, that religion is essential, and that without it we should degenerate to barbarism and brutality; yet we prohibit the state from burdening the citizen with its support, and we content ourselves with recognizing and protecting its observance on secular grounds. Certain professions and occupations in life are also essential, but we have no authority to employ the public moneys to induce persons to enter them. The necessity may be pressing, and to supply it may be, in a certain sense, to accomplish a 'public purpose'; but it is not a purpose for which the power of taxation may be employed. The public necessity for an educated and skillful physician in some particular locality may be great and pressing; yet, if the people should be taxed to hire one to locate there, the common voice would exclaim that the public moneys were being devoted to a private purpose. The opening of a new street in a city or village may be of trifling public importance as compared with the location within it of some new business or manufacture; but, while the right to pay out the public funds for the one would be unquestionable, the other, by common consent, is classified as a private interest, which the public can aid as individuals if they see fit, while they are not permitted to employ the machinery of the government to that end. Indeed, the opening of a new street in the outskirts of a city is generally very much more a matter of private interest than of public concern; so much so that the owner of the land voluntarily throws it open to the public without compensation. Yet, even in a case where the public authorities did not regard the street as of sufficient importance to induce their taking the necessary action to secure it, it would not be doubted that the moment they should consent to accept it as a gift the street would at once become a public object and purpose, upon which the public funds might be expended with no more restraints upon the action of the authorities in that particular than if it were the most prominent and essential thoroughfare of the city.

"By common consent, also, a large portion of the most urgent needs of society are regulated exclusively to the law of demand and supply. It is this in its natural operation, and without the interference of the government, that gives us the proper proportion of tillers of the soil, artisans, manufacturers, merchants, and professional men, and that determines when and where they shall give to society the benefit of their particular services. However great the need in the direction of any particular calling, the interference of the government is not tolerated, because, though it might be supplying a public want, it is considered as invading the domain that belongs exclusively to private inclination and enterprise. We perceive, therefore, that the term 'public purposes,' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification, to distinguish the object for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest, or liberality."

In Loan Association v. Topeka, 20 Wall. 655, 664, 22 L. Ed. 455–461, the Supreme Court of the United States, speaking through Justice Miller, said:

"It is undoubtedly the duty of the Legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified

in interposing when a violation of this principal is clear and the reason for interference cogent. And, in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation, levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

[3] The rigors of the New England winter making it highly desirable that the municipalities should be allowed to become dispensaries of fuel, coal and wood, to their inhabitants at a reduced rate, the Legislature of Massachusetts, in 1892, concluded to give this authority to the towns of that state, if it could do so constitutionally; but having its doubts on the subject, submitted the question to the judges of the Supreme Court. The answer of the judges, reported 155 Mass. 601, 30 N. E. 1143, 15 L. R. A. 810, is a full discussion of the question of what is a public purpose and is as follows:

"Whether the Legislature can authorize a city or town to buy fuel, coal and wood, and to sell them to its inhabitants for fuel, must be determined by considering whether the carrying on of such a business for the benefit of the inhabitants can be regarded as a public service. This inquiry underlies all the questions on which our opinion is required. If such a business is to be carried on, it must be with money raised by taxation. It is settled that the Legislature can authorize a city or town to tax its inhabitants only for public purposes. This is not only the law of this commonwealth, but of the states generally, and of the United States. The following are some of the decisions or opinions on the subject: Kingman v. Brockton, 153 Mass. 255 [26 N. E. 998, 11 L. R. A. 123]; Opinion of Justices, 150 Mass. 592 [24 N. E. 1084, 8 L. R. A. 487]; Mead v. Acton, 139 Mass. 341 [1 N. E. 413]; Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39; State v. Osawkee Twp., 14 Kan. 418, 19 Am. Rep. 99; Mather v. Ottawa, 114 Ill. 659 [3 N. E. 216]; Citizens' Sav. & L. Ass'n v. Topeka, 87 U. S. (20 Wall.) 655, 22 L. Ed. 455; Ottawa v. Carey, 108 U. S. 110 [2 Sup. Ct. 361], 27 L. Ed. 669; Atty. Gen. v. Eau Claire, 37 Wis. 400; State v. Eau Claire, 40 Wis. 533; Allen v. Jay, 60 Me. 124, 11 Am. Rep. 185; Opinion of, Judges, 58 Me. 590.

"It is not easy to determine in every case whether a benefit conferred upon many individuals in a community can be called a 'public service,' within the meaning of the rule that taxes can be laid only for public purposes. In general, however, it may be said that the promotion by taxation of the private interest of many individuals is not a public service, within the meaning of the Constitution. The preamble of the Constitution declares that: 'The end of the institution, maintenance, and administration of government is to secure the existence of the body politic; to protect it, and furnish the individuals who compose it with the power of enjoying in safety and tranquility their natural rights and the blessings of life.' It is declared in part 1, art. 1: 'That all men are born free and equal and have certain natural, essential and inalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness.' Constitutional questions concerning the power of taxation necessarily are largely historical questions. The Constitution must be interpreted as any other instrument with reference to the circumstances under which it was framed and adopted. It is not necessary to show that the men who framed it or who adopted it had in mind everything which by construction may be found in it, but some regard must be had to the modes of thought and action on political subjects then prevailing, to the discussions upon the nature of the government to be established, to the meaning of the language used as then understood, and to the grounds on which the adoption or rejection of the Constitution was advocated before the people. We know of nothing in the history of the adoption of the Constitution that gives any countenance to the theory that the buying and selling of such articles as coal and wood for the use of the inhabitants was regarded at that time as one of the ordinary functions of the government which was to be established. There are nowhere in the Constitution any provisions which tend to show that the government was established for the purpose of carrying on the buying and selling of such merchandise as, at the time the Constitution was adopted, was usually bought and sold by individuals, and with which individuals were able to supply the community, no matter how essential the business might be to the welfare of the inhabitants. The objects of the Constitution was to protect individuals in their rights to carry on the customary business of life, rather than to authorize the commonwealth or the 'towns, parishes, precincts, and other bodies politic' to undertake what had usually been left to the private enterprise of individuals. In the opinion in Citizens' Sav. & L. Ass'n v. Topeka, 87 U. S. (20 Wall.) 655, 664, 22 L. Ed. 455, 461, the Supreme Court

of the United States say: 'It is undoubtedly the duty of the Legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily, and by long course of legislation, levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal.'

"The early usages of towns undoubtedly did not exhaust the authority which the Legislature can confer upon municipalities to levy taxes. Cities and towns, since the adoption of the Constitution, have been authorized to levy taxes for many other purposes than those for which taxes were then levied. Up to the present time, however, none of the purposes for which cities and towns have been authorized to raise money has included anything in the nature of what is commonly called trade or commercial business. Instances can be found of some very curious legislation by towns in the colonial and provincial times, some of which would certainly now be thought to be beyond the powers of towns under the Constitution. Whatever the theory was, towns in fact under the colony charter, and for some time under the province charter, often acted as if their powers were limited only by the opinion of the inhabitants as to what was best to be done. This was the result of their peculiar situation and condition, and the powers of towns or of the general court were not much considered. The exercise of these extraordinary powers, however, gradually died out. The purposes for which, by the province laws, towns were authorized to raise money were for the maintenance of highways, the support of the ministry, schools, and the poor, and for the defraying of other necessary charges arising within the town. The words 'necessary charges' are still retained in the statutes, but they have been strictly construed by the courts. We do not find either in the colony or the province laws any legislation relating to the buying and selling of coal or wood by towns for the use of the inhabitants, or any legislation on any similar subject. It is possible that there may be found in the records of some town a vote or votes showing that the town, in an emergency, was authorized to buy wood or coal for the purpose of supplying its inhabitants with fuel, but we have not found any. Certainly it was not usual for towns to supply their inhabitants with fuel, unless they were paupers. Neither was it usual for towns to supply their inhabitants with grain or other commodities. We know of no instance of this being done, except by the town of Boston. In the fall of 1713

there was a scarcity of grain, and the general court prohibited the exportation of it. 1 Pro. Laws, State Ed. p. 226. The Town of Boston, in March, 1713–14, voted to lay in a stock of grain to the amount of 5,000 bushels of corn, and to store it in some convenient place, and it was left to the selectmen to dispose of it as they saw fit. Eighth Report of Record Commissioners, pp. 101, 104. After that, as shown by the records, the town regularly bought and stored grain and sold it to the inhabitants, as late as 1775, and perhaps later, and it established two granaries, one of which, in the common, remained in use probably as long as the town bought and sold grain. Whether, after the Revolution, the town continued to buy grain we are not informed, as the records have not been printed. The amount which could be sold to any one person was often limited to a few bushels at a time. The report of a committee in 1774 shows that from March, 1769, to March, 1774, the quantity of corn and rye purchased was 5,836 bushels, and that the stock on hand was 376 bushels. It is apparent that the original purpose was to provide against a famine, and that it was not the intention of the town to assume the business of buying and selling all the grain which the inhabitants needed, but of keeping such an amount in store as was necessary in order that small quantities might be obtained, particularly by the poorer inhabitants, at what the selectmen, or a committee of the town, or the town itself, deemed reasonable prices. On May 25, 1795, the town voted to sell the granary. This action of the town of Boston was an exception to the usages of towns, and it appears from the reports of committees that before the Revolution it had come to be considered as of doubtful expediency, and during the Revolution, or not long after, it was discontinued. The nearest analogy under the Constitution to the subject we are considering is the authority given by the recent statute (Stat. 1891, c. 370), whereby cities and towns are empowered to maintain works for the manufacture and distribution of gas or electricity for furnishing lights to the municipalities and their inhabitants.

"In the opinion given to the House of Representatives on May 27, 1890, which is printed in 150 Mass. 592 [24 N. E. 1084] 8 L. R. A. 487, the Justices advised that the manufacture and distribution of gas or electricity for furnishing light to the inhabitants of cities and towns might properly be regarded as constituting a public service. It was there said that: 'It must often be a question of kind and degree whether the promotion of the interests of many individuals in the same community constitutes a public service or not.' Gas or electricity for furnishing light has in recent times become a most convenient means of lighting both public and private buildings, streets, and grounds. It is impracticable that each individual should manufacture gas or electricity for himself; but this can best be done by some company or the

municipality for a considerable territory, and for the use of both the municipality itself and the inhabitants. Everybody who chooses within that territory, cannot be permitted to manufacture and distribute gas or electricity for the public use or the use of other persons, as it is distributed by means of pipes or wires; and the number who properly can be permitted to lay pipes or wires in a given territory must be limited to one, or, at most, to a few, persons or corporations. The pipes or wires must be laid in or over the public ways, or in or over land taken for the purpose, which may require the exercise of the right of eminent domain. These were some of the reasons why the subject seemed to the Justices a proper one for municipal regulation and control and to constitute a service which a municipality could be authorized to perform for itself and its inhabitants. But when the Constitution was adopted the buying and selling of wood and coal for fuel was a well-known form of private business, which was generally carried on as other kinds of business were carried on, and is now carried on in much the same manner as it was then. It was and is a kind of business which, in its relations to the community, did not and does not differ essentially from the business of selling any other of the necessaries of life. Although all kinds of business may be regulated by the Legislature, yet to buy and sell coal and wood for fuel requires no authority from the Legislature, and requires the exercise of no powers derived from the Legislature, and every person who chooses can engage in it in the same manner as in the buying and selling of other merchandise. We are not aware of any necessity why cities and towns should undertake this form of business any more than many others which have always been conducted by private enterprise, and we are not called upon to consider what extraordinary powers the commonwealth may exercise, or may authorize cities and towns to exercise, in extraordinary exigencies, for the safety of the state or the welfare of the inhabitants. If there be any advantage to the inhabitants in buying and selling coal and wood for fuel at the risk of the community on a large scale, and on what has been called the co-operative plan, we are of the opinion that the Constitution does not contemplate this as one of the ends for which the government was established, or as a public service for which cities and towns may be authorized to tax their inhabitants. We therefore answer the questions in the negative."

The apparent urgency of the situation again pressing the Legislature to take some action in the matter, it resubmitted the question to the judges in 1903. The answer reported was as follows:

"It is established that under our Constitution private property cannot be taken from its owner except for a public use. This is equally true whether the property is a dwelling house, taken by right of eminent domain, or money demanded by the tax collector. The establishment of a business like the buying and selling of fuel requires the expenditure of money. If this is done by an agency of the government, there is no way to obtain the money except by taxation. Money cannot be raised by taxation except for a public use. Until within a few years, it generally has been conceded, not only that it would not be a public use of money for the government to expend it in the establishment of stores and shops for the purpose of carrying on a business of manufacturing or selling goods in competition with individuals, but also that it would be a perversion of the function of government for the state to enter as a competitor into the field of industrial enterprise with a view either to the profit that could be made through the income to be derived from the business or to the indirect gain that might result to purchasers if prices were reduced by governmental competition. There may be some now who believe it would be well if business was conducted by the people collectively, living as a community, and represented by the government in the management of ordinary industrial affairs. But nobody contends that such a system is possible under our Constitution. It is plain, however, that taxation of the people to establish a city or town in the proprietorship of an ordinary mercantile or manufacturing business would be a long step towards it. If men of property, owning coal and wood yards, should be compelled to pay taxes for the establishment of a rival coalyard by a city or town, to furnish fuel at cost, they would thus be forced to make contributions of money for their own impoverishment; for, if the coalyard of the city or town was conducted economically, they would be driven out of business. A similar result would follow if the business of furnishing provisions and clothing, and other necessaries of life, were taken up by the government; and men who now earn a livelihood as proprietors would be forced to work as employés in stores and shops conducted by the public authorities. Except for the severely onerous conditions from which we are now suffering, the causes of which arose outside of this state, beyond the reach of our legislative enactments, there is nothing materially different between the proposed establishment of a governmental agency for the sale of fuel and the establishment of a like agency for the sale of other articles of daily use. The business of selling fuel can be conducted easily by individuals in competition. It does not require the exercise of any governmental function, as does the distribution of water, gas, and electricity, which involves the use of the public streets and the exercise of the right of eminent domain. It is not important that it should be conducted as a single large enterprise, with supplies emanating from a single source, as is required for the economical management of the kinds of business last mentioned. It does not even call for the investment of a large capital,

but it can be conducted profitably by a single individual of ordinary means. We therefore have no hesitation in answering the first three questions in the negative." Re Municipal Fuel Plants, 182 Mass. 605, 66 N. E. 25, 60 L. R. A. 592.

The syllabus of the case reads as follows:

"Municipalities have authority to provide fuel for paupers; but they cannot be given power by the Legislature to buy and sell fuel in competition with private enterprise, although it is scarce and high in price, and the cost to consumers may be thereby reduced, unless there is such a scarcity as to create a general and widespread distress in the community, which cannot be met by private enterprise."

Very instructive in connection with our question, although not bearing directly upon it, are the two decisions of the Supreme Court of South Carolina in the celebrated Liquor Dispensary Cases.

In the case of McCullough v. Brown, 41 S. C. 220, 19 S. E. 458, 23 L. R. A. 410, the Supreme Court of South Carolina said:

"Finally the constitutionality of the dispensary act is assailed upon the ground that the Legislature have undertaken thereby to embark the state in a trading enterprise, which they have no constitutional authority to do; not because there is any express prohibition to that effect in the Constitution, but because it is utterly at variance with the very idea of civil government, the establishment of which was the expressly declared purpose for which the people adopted their Constitution; and therefore all the powers conferred by that instrument upon the various departments of the government must necessarily be regarded as limited by that declared purpose. Hence, when, by the first section of the second article of the Constitution, the legislative power was conferred upon the General Assembly, the language there cannot be construed as conferring upon the General Assembly the unlimited power of legislating upon any subject, or for any purpose, according to its unrestricted will, but must be construed as limited to such legislation as may be necessary or appropriate to the real and only purpose for which the Constitution was adopted—to wit, the formation of a civil government. In this connection it is noticeable that the word 'all' is not used in the section above referred to, but the language used is, 'the legislative power,' meaning 'such legislative power as may be necessary or appropriate to the declared purpose of the people in framing their Constitution and conferring their powers upon the various departments constituted for the sole purpose of carrying into effect their declared purpose. It is manifest from the numerous express restrictions upon the legislative will found in the Constitution that the people were not willing to intrust even their own representatives with unlimited legislative power, but, as if not satisfied with these numerous express restrictions, and perhaps fearing that some important right might have been overlooked, a general clause, not usually found in state Constitutions, was inserted, apparently designed to cover any such omissions; for in section 41 of article 1 it is expressly declared that: 'The enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people.' Now, upon well-settled principles of constitutional construction, we are not at liberty to disregard this clause, but must give it some meaning and effect. It seems to us that the true construction of this clause is that, while there are many rights * * * reserved to the people, not expressly, but by necessary implication, which are beyond the reach of the legislative power, unless such power has been expressly delegated to the legislative department of the government. These views have not only the support of the highest authority in this country, as may be seen by reference to the cases of Citizens' Sav. & L. Ass'n of Cleveland v. Topeka, 87 U. S. (20 Wall.) 655, 22 L. Ed. 455, and Parkersburg v. Brown, 106 U. S. 487 [1 Sup. Ct. 442] 27 L. Ed. 238, but have been distinctly adopted by the Supreme Court of the state in Feldman v. Charleston, 23 S. C. 57, 55 Am. Rep. 6, as well as by the courts of Massachusetts and Maine, as may be seen by reference to Allen v. Jay, 60 Me. 124, 11 Am. Rep. 185, and Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39; and, what is more, they were applied to the vital power of taxation—a power absolutely essential to the very existence of every government. These cases substantially hold that, although there may be no express restrictions contained in a state Constitution forbidding the imposition of taxes for any other purpose than a public purpose, yet such a restriction must necessarily be implied from the very nature of civil government; and hence the legislative department, under the general power of taxation conferred upon it, cannot impose any tax except for some public purpose. Upon the same principle it seems to us clear that any act of the Legislature which is designed to or has the effect of embarking the state in any trade which involves the purchase and sale of any article of commerce for profit, is outside and altogether beyond the legislative power conferred upon the General Assembly by the Constitution, even though there may be no express provision in the Constitution forbidding such an exercise of legislative power. Trade is not, and cannot properly be, regarded as one of the functions of government. On the contrary, its function is to protect the citizen in the exercise of any lawful employment, the right to which is guaranteed to the citizen by the terms of the Constitution, and certainly has never been delegated to any department of the government."

In the case of State v. Aikin, 42 S. C. 222, 20 S. E. 221, 26 L. R. A. 345, the same court reversed this decision on the ground that no rule of property was involved; that no one could acquire vested rights in the sale of intoxicating liquors; that intoxicating liquors could not be placed on the same footing with other commodities; and that the state, having the authority to prohibit the sale of intoxicating liquors, had authority to dispense them itself as a means of regulation. But in this decision the court reaffirmed and emphasized the rule that the state was without authority to engage in trade or commerce. On this general principle the court said:

"We think differences of opinion as to the constitutionality of this act arise from the attempt on the part of some to apply to it the law applicable to the ordinary commodities of life. * * *

"It is because liquor is not regarded as one of the ordinary commodities that the act of 1892 prohibiting its sale was, as to that matter, construed to be constitutional. We cannot for a moment believe that the court would have declared an act constitutional that prohibited entirely the sale of corn, cotton, or other ordinary commodities. It is fallacious to argue, in the light of this distinction, so thoroughly sustained by the authorities, that, if the government can take the exclusive control of the liquor traffic, it can do so as to any other avocations in life."

The court said further:

"It is contended that the foregoing section prevents the Legislature from embarking the state in a commercial enterprise. We have no doubt that if such was the object of the act, and it was not intended as a police measure, it would be unconstitutional, even in the absence of section 41, art. 1. As we have said, if the act is not a police measure, it is unconstitutional. It is quite a different thing, however, when trade is simply an incident to a police regulation."

In Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, the Minnesota Supreme Court denied the authority of the state Legislature to authorize a municipality to maintain an elevator or warehouse for the public storage of grain.

In Keen v. Waycross, 101 Ga. 588, 29 S. E. 42, the Supreme Court of Georgia held that a town had no authority to engage in the business of selling plumbers' materials even in connection with the management of its waterworks plant.

And in Re Opinion of Judges, 58 Me. 590, the Supreme Court of Maine held that the Legislature could not empower a town to establish manufactories on its own account and run them by the ordinary town officers or otherwise.

It will be noted that Judge Cooley, in People v. Salem, supra, and Judge Miller, in Loan Association v. Topeka, supra, would determine the question of whether a particular purpose is public or not mainly according to what has been the settled usage; Judge Miller very properly adding, however, that usage is not the sole criterion.

In the latter connection, the following extract from the decision of the Court of Appeals of New York, in the case of Sun Printing Co. v. New York, 8 App. Div. 230, 40 N. Y. Supp. 607, is apposite.

"In considering this question it must be premised that cities are not limited to providing for the strict necessities of their citizens. Under legislative authority, they may minister to their comfort, health, pleasure, or education. They are not limited to policing the city, to paving the streets, to providing it with light, water, sewers, docks, and markets. They may also be required by the sovereign power to furnish their citizens with schools, hospitals, dispensaries, parks, libraries, and museums, with zoological, botanical, and other gardens. They may thus gratify our ears with music of a summer afternoon, or minister to our comfort by providing us with public baths. Expenditures in all these directions under legislative authority have never been questioned. Where, then, shall we draw the line? It would be very simple to draw at those purposes for which precedent in the past can be found, and exclude all others. This test should be easy of application, but would be essentially vicious and erroneous. Growth and extension are as necessary in the domain of municipal action as in the domain of law. New conditions constantly arise which confront the Legislature with new problems. As the structure of society grows more complex, needs spring up which never existed before. These needs may be so general in their nature as to affect the whole country or the whole state, or they may be local and confined to a single county or municipality.

In any case, it is the duty of that legislative body which has the power and jurisdiction to apply the remedy. To hold that the Legislature of this state, acting as the parens patriæ, may employ for the relief or welfare of the inhabitants of the cities of the state only those methods and agencies which have proved adequate in the past would be a narrow and dangerous interpretation to put upon the fundamental law. No such interpretation has thus far been placed upon the organic law by the courts of this state. Whenever the question has been considered, it has been universally treated in the broadest spirit."

What is meant here by treating the question in the broadest spirit is that the decision of the Legislature upon any particular point within its legitimate sphere of action is not to be overridden by the courts unless upon the clearest grounds of its being in violation either of the Constitution itself or of those fundamental principles which, apart from all written constitutional sanction, underlie our system of government. Touching this conclusiveness of the legislative decision, Judge Cooley, in his work on Taxation (2d Ed.) p. 103, says:

"It is implied in all definitions of taxation that taxes can be levied for public purposes only. Differences of opinion frequently arise concerning the power to impose taxation in particular cases, but all writers who treat the subject theoretically and all jurists agree in the fundamental requirement that the purpose shall be public, and they differ, when they differ at all, upon the question whether the particular purpose proposed is within the requirement. It is also agreed that the determination what is and what is not a public purpose belongs in the first instance to the legislative department. It belongs there because the taxing power is a branch of the legislative, and the Legislature cannot lie under the necessity of requiring the opinion or the consent of another department of the government before it will be at liberty to exercise one of its acknowledged powers. The independence of the Legislature is an axiom in government; and to be independent it must act in its own good time, on its own judgment, influenced by its own reasons, restrained only as the people may have seen fit to restrain the grant of legislative power in making it. The Legislature must, consequently, determine for itself, in every instance, whether a particular purpose is or is not one which so far concerns the public as to render taxation admissible."

He adds:

"But it is also generally admitted that the legislative determination is not absolutely conclusive."

He then mentions the necessity of the purpose of a tax being public, and that the taxpayer may resist a tax whose purpose is not public, and adds:

"It is not inconsistent with this doctrine that in every instance the highest consideration should be paid to the determination of the Legislature that a tax should be laid. It is not lightly to be assumed that its members have come to the examination of the subject with any other than public motives, or that they have failed to give it due consideration or reflection. The presumption on the other hand must always be that they have considered it with honesty and fair purpose, and that their action is the result of their deliberate judgment. And with all these presumptions tending to support the legislative action, it would seem but reasonable and proper that the courts should support it when not clearly satisfied that an error has been committed. This is the general rule in constitutional law when the validity of legislation is involved, and it is applicable with peculiar force to the case of a legislative decision upon the purpose for which a tax may be laid."

The Legislature, by passing the said statute has determined that the establishing and carrying on of an ice plant by a town for supplying the citizens with ice is a purpose "strictly public in its nature"; and our question is whether that conclusion is clearly incorrect.

The only court that has had occasion to consider the question of whether the engaging in the ice business is a function of a public nature is the Supreme Court of Georgia. In Holton v. Camilla, 134 Ga. 560, 68 S. E. 472, 31 L. R. A. (N. S.) 116, 20 Ann. Cas. 199, that court said:

"If, in the hot season of the year, the inhabitant of the city must, for sanitary reasons, relinquish the cool draft from the well because, as has been demonstrated, wells of pure water cannot be maintained in populous communities, surely the city would have the right, were it practical, to cool the water which it delivers through pipes as a substitute, and which ofttimes is scarcely drinkable in its heated con-

dition. If not practicable to cool it in the pipes, and if it be necessary to the welfare, comfort, and convenience of the inhabitants that its temperature be lowered before being used for drinking purposes, why cannot the city provide for the delivery of a part of it in a frozen condition to be used in cooling such part of the balance as is used for drinking purposes? Is the difference between water in a liquid and in a frozen condition a radical one? Upon what principle could the doctrine rest that liquid water may be delivered by the city to its inhabitants by flowage through pipes, but that water in frozen blocks cannot be delivered by wagons or otherwise? If the city has a right to furnish its inhabitants with water in a liquid form, we fail to see * * * why it cannot furnish it to them in a frozen condition. * * * It is a well-known fact that one of the main uses to which ice is put is the cooling of water for drinking purposes; and when it is used for this purpose, if impure, it is as apt to be deleterious to the consumer, as any other impure water. Why, then, in the exercise of its police power, may not a city guard against impurities in the ice, as well as the water used by its inhabitants? Nor do we see any rational objection on the idea that the city will be engaging in a manufacturing enterprise. The city might perhaps equally as well be said to be manufacturing when, by the use of a filtering process, it changes impure water into that which is pure. When, in connection with its waterworks system, it produces ice, it merely, by certain processes, changes the form and temperature of a part of the water supplied by that system. We do not think the operation by the city of Camilla of an ice plant in connection with its waterworks system, for the purpose of furnishing ice to its inhabitants, is in violation of the sections of the Constitution referred to in the plaintiff's petition, or that it is illegal for any reason."

The same line of reasoning here adopted by the Supreme Court of Georgia having been presented incidentally by counsel in the case of State v. Thompson, 149 Wis. 488, 137 N. W. 20, 43 L. R. A. (N. S.) 339, Ann. Cas. 1913C, 774, in the Supreme Court of Wisconsin, Judge Timlin, in a concurring opinion, made the following answer to it:

"It was said by counsel in argument that the furnishing of water by a city to its inhabitants is a municipal affair; that ice is but frozen water; hence the furnishing of ice must be a municipal affair. But things which are similar from a physical or chemical viewpoint may be dissimilar from the legal viewpoint. Under a statute authorizing a city to buy coal, it probably could not buy diamonds, although it is said they are chemically identical. Neither is atmos-pheric gas passed through a varying aperture and articulated by varying contacts always equivalent to argument. The difference between the collection and distribution of water by means of pipes laid in the streets and the manufacture, sale and distribution of ice is that the first is in the nature of a monopoly, while the second is a competitive business enterprise. The first does not depend so largely upon skill in management."

Putting aside the frozen water argument of the Georgia court as having been well answered by the amusing witticism of the Wisconsin court, we note that, as pointed out by the Wisconsin court, all analogy between the municipal distribution of water and the municipal distribution of ice is destroyed by the fact that for the one business pipes have to be laid in the public streets, and, necessarily, for doing this, the streets have to be torn up and disturbed, whereas the other is a purely competitive business enterprise. There would be analogy between the two if the city were to abandon the sovereign mode of water distribution by means of underground conduits through the public streets, and to go peddling the liquid, as is done in towns unprovided with waterworks and unblessed by a sufficient rainfall for gathering a supply in cisterns, and as has to be done with ice. There would then be complete analogy; but everybody would then see that the town was no longer discharging a sovereign function, but carrying on a private enterprise.

The invocation of the police power by the Georgia court amounts practically to an acknowledgment of the weakness of its side of the argument. For nothing is better established than that, when a legislative measure is dependent for its execution upon the exercise of the taxing power, its validity must be determined by the validity of the tax that will have to be imposed for carrying it out.

"As the funds of a municipal corporation are raised by taxation, the power of the Legislature to authorize such a corporation to incur indebtedness, or to expend its funds for the purpose of

aiding individuals or individual enterprises, depends upon the fundamental question whether the corporation could be authorized to levy a tax for the purpose of liquidating the indebtedness to be incurred or could have levied a tax for the purpose of the expenditure proposed." A. & E. E. of L. vol. 20, p. 1084.

See, also, Loan Ass'n v. Topeka, supra.

[4] A city may, of course, "guard against impurities in the ice as well as in the water [and, we may add, in the milk, and fish, and meat, and bread] used by its inhabitants"; but the fact that it can do this, casts no light upon the question of whether it may go into the ice or the milk, or the fish, or the meat, or the bread, business. The terms "police power" and "eminent domain" have a meaning coextensive with sovereign power or sovereignty; but, as said by the Supreme Court of Minnesota, in a case where the police power was invoked for saving from nullity a plan to provide for the erection of a state grain elevator and storage warehouse (Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, supra):

"As understood in American constitutional law, the term means simply the power of the state to impose those restraints upon private rights which are necessary for the general welfare of all, and is but the power to enforce the maxim, 'Sic utere tuo ut alienum non lædas.' "

In other words, it is a power to regulate the business of others, and not a power to go into business. Of course, if the business cannot be regulated otherwise than by the government going into it, or perhaps, even if, in the opinion of the Legislature, that mode of regulation is the most practical and best, such mode can be adopted; but nothing of that kind could be pretended in the case of the grain or the ice business. The police power, as a separate and distinct power from that of taxation, or in its meaning of one of the dismemberments of the sovereign power, is easily sufficient for regulating the ice business, without aid from the taxing power; and it can play no part in this case.

If, as stated in the argument, the ice business in this country is a monopoly that needs regulation, the power of taxation is not the proper power to use for that purpose. Such a thing might be done if the Constitution contained no restrictions on that power; but in this state the Constitution has practically put that power in a strait-jacket; and it goes without saying that the Legislature is powerless to liberate it therefrom.

One of these restrictions is that in municipal affairs that power can be exercised only where the purpose is "strictly public in its nature." The word "strictly" here inserted by the framers of the Constitution has to be reckoned with. In other words, in this state it does not suffice that a purpose be merely public in order that the power of taxation may be exercised for it, but it must be strictly so, and be so "in its nature."

Among the definitions given to the words "strict" and "strictly" in Webster's New International Dictionary are the following:

"Strict: Exact; accurate; precise; undeviating; rigorously nice; hence, rigid in interpretation; free from latitude; as, to keep strict watch, or strict silence; strict construction of a law.

"Governed or governing by exact rules; rigorous; as very strict in observing the Sabbath: strict discipline.

"Strictly: In a strict manner; closely; precisely; rigorously; stringently; without latitude; positively."

The Century Dictionary gives the derivation of the word as from the Latin "strictus, past participle of stringere, draw tight, bind, contract," and, among other definitions, gives the following:

7. "Exacting; rigorous; severe; rigid.
8. "Restricted; taken strictly, narrowly, or exclusively.

"Strictly: Rigorously; severely; without remission or indulgence; with close adherence to rule."

In the interpretation of a statute or Constitution words are understood in their ordinary, popular meaning, and every word is to be given effect, if possible; none is to be

supposed to have been inserted by accident or inadvertence or without the deliberate intention that it should be understood in its ordinary meaning and given effect accordingly. Hence, in the interpretation of this article 224, the word "strict," qualifying the word "public," is to be understood in its ordinary, popular meaning as given hereinabove from the dictionaries, and is to be given effect accordingly. This is so elementary as not needing support by citation of authority. Let it be noted also that this article 224 does not contain this same qualification, limitation, or restriction when describing the state purposes for which the taxing power may be exercised, but has added it only when describing the municipal purposes. Its language is that: ·

"The taxing power may be exercised by the Legislature for state purposes [no qualification or restriction] and by municipal corporations for municipal purposes strictly public in their nature."

This contrast between the delegation of the power for state purposes and for municipal purposes places in a strong light the deliberate intention of the framers of this article 224 that the municipalities should be required to adhere rigidly to purposes strictly, or, in other words, clearly, or admittedly, public in their nature.

And it goes without saying that this provision of the Constitution is as binding on the Legislature as it is on the municipalities; that the Legislature can no more abate or arrest any part of its authority and controlling influence than the municipality can; and also that its rigid enforcement is as binding on the courts as the due observance of it is binding on the Legislature and the municipalities. Hence, unless a purpose is strictly public in its nature, the Legislature is as powerless to authorize the use of the taxing power for it as the municipality would be to use said power for the same purpose without legislative authority; and, if the attempt is made to do so the courts are bound to enforce the constitutional provision.

It may not be amiss to call attention to the fact that, in the intention of this article 224, the Legislature cannot, by its fiat, make that a public purpose which is not already so. The requirement is that the purpose be in its nature public; that is to say, that it be of that character independently of the legislative fiat. This restriction of article 224 would be no restriction at all if the Legislature could make public in its nature every purpose for which it desired to delegate the taxing power to a municipality.

By a purpose being strictly public in its nature this article 224 does not mean merely that the purpose must be unaffected by or uncoupled with a private interest; or, in other words, merely that no private individual or private corporation be associated in the business with the municipality. It means that the business must in itself be public; or, in other words, that it must be a municipal business, such business as pertains to the administration of the municipality as a municipality. This results from the force of the expression "in its nature"; not because the Legislature chooses that the municipality may or shall conduct the business; but because the business is in its nature public. If the idea had been merely to prohibit or preclude the use of the taxing power in the interest of private individuals, or corporations, either in partnership with the municipality or separately, this provision would have been left out as useless, since ample provision had already been made by article 58, in the most specific and searching terms, against any use of the taxing power in connection with private interests.

No one familiar with the discussions that had taken place both in and out of the courts prior to the adoption of this restriction in article 224 touching this question of

how far the taxing power may be used by municipalities for engaging in business usually left to private enterprise, such as public grist mills, storage warehouses, distribution of fuel, etc., can fail to see at a glance that this restriction was adopted for the very purpose of settling that question in this state; of giving constitutional sanction in this state to the principle which, independently of constitutional expression, underlies our form of government, and, as such, had been enforced in other states—that the taxing power can be used only for public purposes.

The framers of this article 224 were familiar with these discussions, and knew that, while there was no disagreement on the point that the taxing power can be legitimately used only for a public purpose, there was great difficulty in ascertaining what was and what was not a public purpose; and to one familiar with the said discussions it is obvious that the peculiar phraseology of this article 224 was adopted with a view to removing that difficulty in this state as far as possible. It was not possible to enumerate what purposes should be held to be public and what not. General language had to be used; and the provision was worded as we find it; that the purpose must be public in its nature, and that it must be so, not merely by taking a liberal or latitudinous view of the matter, or, as some decisions had held, by viewing it in "a liberal spirit" but "strictly" so; i. e.:

"Restrictedly; severely; narrowly or exclusively; rigorously; without latitude; positively; with close adherence to rule."

Now, is this business in which the defendant municipality proposes to engage by this ordinance of this strictly public character in its nature?

We think clearly not. The business of manufacturing and selling ice has heretofore been left to private enterprise; as much so as the business of making and selling bread or of any of the articles of household consumption.

The only feature of it that is suggested as likely to impart to it a public character is the growing necessity of ice as an article of household consumption in modern life; but ice is no more necessary than bread and meat. In fact, this argument of necessity has been so thoroughly pulverized, annihilated, by Judge Cooley in the Salem Case, supra, that the discussion of it here would be mere waste of time. And the argument of cheapness of production comes in the same category and must share the same fate; unless, indeed, as intimated hereinabove by us, under very special circumstances such as are not revealed by the record in this case.

Nothing, then, indicates the public nature of this business, and still less its strictly public nature, and the case resolves itself into the proposition that, in disregard of the said restriction of article 224, the Legislature has undertaken to authorize the municipalities of this state to use the taxing power for a purpose not strictly public in its nature. In such a case the courts are left to choose between the Constitution and the Legislature, and necessarily must obey the Constitution.

In the brief of the defendant, the statement is made that:

"So far as research has been able to disclose, there is only one municipal ice plant in active operation in the United States, and this is in Weatherford, Okl."

The "research" here spoken of is not that of the defendant or of its counsel, but of J. Walls Wentworth, appointed by the president of the borough of Manhattan to gather statistical information on the subject of municipal and government ice plants, "and to extend his research in foreign countries as well as in the United States." This re-

search shows that there are two towns in England—Bolton and Wolverhampton—and several in Italy that manufacture ice for sale, and none other in the world, except the Oklahoma town. Judging from this, any one would unhesitatingly say that the making of ice for sale was not supposed by the world in general to be a municipal function; but that, on the contrary, the consensus of opinion throughout the civilized world was that it was not.

We do not lose sight of the fact that, as well as observed by the Court of Appeals of New York, supra, changed conditions may bring about new purposes for which the taxing power may be legitimately exercised; but ice was being manufactured in cities for sale long before the adoption of the Constitution of 1898, and the need for municipal distribution of ice was at that time just as great and as well known to everybody as now; and hence no changes brought about by new conditions can be invoked in connection with that business.

Not a city or town of the state, except the defendant, has sought to take advantage of this law, so far as we know. And we should not wonder at this lack of interest, if the operation of this law is to be the same in all the towns and cities as is shown in this case it would be the defendant town. The soda water stands are shown to consume a large quantity of ice and to pay but an insignificant amount of taxes. The Rock Island Railroad pays over $3,000 of taxes, approximately one-fourth of the total tax of the town, and consumes but an insignificant amount of ice. The operation of this ice plant scheme would be to make the Rock Island Railroad and other large taxpayers who at the same time are small consumers of ice pay in part for the ice to be furnished by the town to the small taxpayers who are at the same time large consumers of ice. What would be the operation of this law in the city of New Orleans with its street railways and banks and agencies of all kinds paying heavy taxes and needing no ice save a lump for the water cooler, is easily imagined. The pockets of these large taxpayers would be gone into by the city to enable her to drive out of business and destroy the existing ice companies. The operation of this law is thus referred to as calculated to throw a sidelight upon the question of whether this ice making and selling enterprise by a town or city is or is not a "purpose strictly public in its nature."

For the support of its paupers and indigent sick the municipality may go as deeply as the necessity of the case may require into the pockets of its large taxpayers; but it cannot do so for the purpose of selling ice, or bread, or meat, or drugs, etc., etc., more cheaply to its inhabitants in general than the regular merchants are doing. This would be paternalism pure and simple, a thing foreign to our form of government.

The judgment appealed from is therefore set aside, and it is now ordered, adjudged, and decreed that the ordinance of the town of Ruston No. 120, adopted on October 28, 1912, be, and the same is, hereby decreed to be unconstitutional, null, and void, and is hereby annulled, that an injunction issue enjoining the mayor and board of aldermen of said town from attempting to carry said ordinance into effect, and that defendant pay the costs of this suit.

O'NIELL, J., takes no part.